**AMERICAN FOOTBALL LEAGUE et al.**

v.

**NATIONAL FOOTBALL LEAGUE et al.**

Civ. No. 12559.

United States District Court
D. Maryland.
May 21, 1962.

See also 27 F.R.D. 264.

Warren E. Baker, Washington, D. C., Richard S. Harrell, Thomas F. O'Toole, New York City, and Chadbourne, Park, Whiteside & Wolff, New York City, for plaintiffs.

Gerhard A. Gesell, Hamilton Carothers, Charles W. Havens, III, and Covington & Burling, Washington, D. C., and William D. Macmillan, William A. Fisher, Jr., and Semmes, Bowen & Semmes, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

In this action for treble damages and injunctive relief under the antitrust laws, plaintiffs, the American Football League (AFL) and its members, charge defendants, the National Football League (NFL) and most of its members, with monopolization, attempted monopolization and conspiracy to monopolize major league professional football.

It is not disputed that all of the parties to the case are engaged in interstate commerce and subject to the provisions of the antitrust laws. Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456. See also United States v. National Football League, E.D.Pa., 116 F.Supp. 319. At a pretrial conference the parties agreed that the trial should be conducted in two stages: that the court first hear evi-

dence on and determine the issue of liability (including the requirement that plaintiffs prove some injury from each of the alleged violations); and, if liability is found, that the court thereafter hear evidence on and consider the issue of relief (the amount of damages or the equitable relief to which the several plaintiffs may be entitled).

### The Parties

The AFL was organized in the latter half of 1959, and began play in 1960. Joe Foss has been its only Commissioner. At the time this suit was filed, October 14, 1960, its member teams or franchisees and the principal owners thereof were:

Eastern Division:
Boston Patriots (Sullivan)
Buffalo Bills (Wilson)
Houston Oilers (K. S. Adams, Jr.)
New York Titans (Wismer)

Western Division:
Dallas Texans (Lamar Hunt)
Denver Broncos (Howsam)
Los Angeles Chargers (Hilton. Transferred to San Diego after 1960 season.)
Oakland Raiders (a triumvirate)

The NFL was organized in 1920 and since 1933 has had from 10 to 14 teams. Bert Bell served as Commissioner until his death on October 11, 1959; thereafter Austin Gunsel was Acting Commissioner until January 1960, when Pete Rozelle was elected Commissioner. As of the date of suit, its teams, their principal owners, and others who figured prominently in the evidence were:

Eastern Division:
Chicago Cardinals (Mr. and Mrs. Wolfner. Transferred to St. Louis before 1960 season.)
Cleveland Browns (Jones; Paul Brown, general manager and coach.)
Dallas Cowboys (Clint Murchison, Jr. Began play as a "swing team" in 1960.)

New York Giants (Mara and sons)
Philadelphia Eagles (McNamee, Donohue)
Pittsburgh Steelers (Rooney)
Washington Redskins (Marshall)

Western Division:
Baltimore Colts (Rosenbloom)
Chicago Bears (Halas)
Detroit Lions (Anderson)
Green Bay Packers (Olejniczak; Lombardi, general manager and coach.)
Los Angeles Rams (E. W. Pauley, Sr.; Rozelle, general manager until January 1960.)
San Francisco 49'ers (Morabito)
Minnesota Vikings (Winter, Boyer, Skoglund, Ridder and Haugsrud. Began play in 1961.)

Plaintiffs did not sue the Minnesota Vikings. Before trial, but after the opinion of this court on jurisdiction and venue, 27 F.R.D. 264, plaintiffs dismissed the Los Angeles Rams and the San Francisco 49'ers.

Each of the leagues is an unincorporated association, with permanent franchises which remain the property of the members to whom issued unless forfeited or transferred with the approval of the league.

### The Issues

The successful operation of a major league professional football team requires (1) membership in a league in which the several clubs are reasonably well matched in playing strength and are located in areas which can and will support the teams by attendance throughout the season sufficient to provide adequate revenues for both the home and visiting clubs, (2) the acquisition of a group of capable players, and (3) the sale of television rights.[1] Plaintiffs allege that defendants monopolized, attempted to monopolize and conspired to monopolize each of these three areas of competition.

---

1. And to a minor extent, radio, about which no issue was raised in this case. The sale of TV rights now furnishes an important share of the annual income of all the clubs.

With respect to (1), plaintiffs contend that they have shown that all defendants *monopolized* and that all defendants, except the Washington Redskins, *attempted* to monopolize and *conspired* to monopolize the metropolitan areas in which franchises can successfully be located. Plaintiffs argue that the granting of NFL franchises to Dallas and to Minneapolis-St. Paul, at the times and under the circumstances shown by the evidence, and statements made with respect to a proposed franchise for Houston, constituted an exercise of monopoly power, and that those acts were done as part of an attempt or a conspiracy to monopolize. On the other hand, defendants deny that they had monopoly power, and contend that those franchises were granted and those statements were made pursuant to a policy of expansion adopted by the NFL before the AFL was organized, and that the timing was at most an effort by the NFL and its members to compete more effectively with proposed AFL teams in the particular cities.

With respect to (2) above—acquisition of players—plaintiffs conceded at the close of their case that they had not proved *any* violation of the antitrust laws entitling them to recover herein.

With respect to (3), they conceded that they had not shown the requisite intent to support their charge that defendants had *attempted* to monopolize or *conspired* to monopolize with respect to the sale of TV or radio rights; but they contend that they have shown that defendants possessed monopoly power, and that the approval by the NFL Commissioner of the TV contract made by the Baltimore Colts and the Pittsburgh Steelers with the National Broadcasting Company was an exercise of that power which renders defendants liable on the charge of mo-

nopolization. Defendants contend that the Commissioner was obliged to approve the contract under the principles laid down by Judge Grim in United States v. National Football League, supra, and it was agreed that further evidence and argument on this point should await the decision of the court on the question whether the NFL had monopoly power.

### Elements of Offenses Charged

The several charges of (a) monopolization, (b) attempt to monopolize and (c) combination or conspiracy to monopolize require proof of different elements.

■ (a) *Monopolization.* To prove monopolization in this private antitrust suit plaintiffs must show (1) that defendants possessed monopoly power and (2) that they undertook some course of action the consequence of which was to exclude competition or prevent competition in the business of major league professional football or which was undertaken with the purpose or intent to accomplish that end. United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. United Shoe Machinery Corp., D.Mass., 110 F. Supp. 295, 342, aff'd per curiam 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.

■ (1) "Monopoly power is the power to control prices or exclude competition." United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264. In the same case, citing Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619, the Court said that a party has monopoly power if it has "over 'any part of the trade or commerce among the several States,' a power of controlling prices or unreasonably restricting competition." 351 U.S. at 389, 76 S.Ct. at 1004.[2]

2. Plaintiffs ask the court to adopt as a definition of monopoly power, the following passage quoted from the opinion of District Judge Duncan in United States v. Kansas City Star Co., reported in 1955 CCH Trade cases, paras. 68,040, at p. 70,372, "the power to foreclose competition or to secure for itself a competitive advantage when it desires to do so

* * *." That passage immediately preceded the following statement: "It is not necessary that competition be actually excluded, but it is sufficient that such person or persons possess power to exclude actual or potential competition." It was the latter statement which was used in the charge to the jury and was approved by the Eighth Circuit on appeal, Kansas City

■ "Monopoly is a relative word." United States v. Associated Press, S.D. N.Y., 52 F.Supp. 362, 371, aff'd 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. Whether the sole business in a particular field has monopoly power depends upon the nature of the business.[3] Those wishing to operate professional football teams must belong to a league. The test of monopoly power in this case, therefore, is whether the NFL had sufficient power to prevent the formation or successful operation of a new league. It is not sufficient that they might have had the power to exclude a new league from a particular city or group of cities, unless the power to exclude from that city or group of cities would have effectively prevented the formation or operation of a new league.

■ (2) A business organization which has acquired monopoly power is guilty of monopolization if it undertakes a course of action the consequence of which would be to exclude competitors or prevent competition. Proof of a specific intent is not necessary. United States v. United Shoe Machinery Corp., supra; United States v. Griffith, supra; Kansas City Star Company v. United States, 8 Cir., 240 F.2d 643, 658, cert. den. 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed. 2d 1438; United States v. Aluminum

Co. of America, 2 Cir., 148 F.2d 416, 428–29.[4]

However, it cannot be required to forego normal competitive business methods to further legitimate business ends, as distinguished from acts which are done with the intent to create or preserve a monopoly, or which would have the consequence of excluding competitors from a relevant market. See Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683; United States v. Griffith, supra; Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 1 Cir., 194 F.2d 484, 488, cert. den. 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636; United States v. United Shoe Machinery Corp., supra.[5]

■ (b)–(c). *Attempt and Conspiracy.* There may be an attempt to monopolize, or a combination or conspiracy to monopolize, without the offender or offenders actually having monopoly power. But an essential element of an attempt to monopolize, or of a combination or conspiracy to monopolize, is a specific intent to destroy competition or build monopoly. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d at 432; American Tobacco

Star Co. v. United States, 240 F.2d 643, 663, cert. den. 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438, and which properly defines monopoly power, with reference to some relevant market or area of effective competition.

3. The Associated Press was an organization which had no inherent numerical limit; its bylaws were held to have been designed to stifle competition by restricting membership; and the existence of other press services did not prevent it from having and exercising monopoly power. A football league, on the contrary, has some inherent numerical limit; it can legitimately refuse to expand beyond that limit.

4. Monopoly involves something more than extraordinary commercial success; as Senator Hoar pointed out, 21 Cong.Rec. 3152, there must be "something like the use of means which made it impossible for other persons to engage in fair competi-

tion". See United States v. E. I. Du-Pont De Nemours & Co., 351 U.S. at 390, 76 S.Ct. at 1004.

5. Plaintiffs admit that they have not shown that the alleged monopoly power was illegally acquired. Defendants urge that where monopoly power has been *legally* acquired through normal growth, or has been thrust upon the defendant, the acts for which it may be held liable must be "predatory acts", citing United States v. E. I. DuPont De Nemours & Co., D.Del., 118 F.Supp. 41, 213–218, 223, aff'd on other grounds, 351 U.S. 377, particularly 390, 391, 76 S.Ct. 994, 100 L.Ed. 1264. This proposition finds some support in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d at 429, and is not fully answered by United States v. Griffith, 334 U.S. at 107, 68 S.Ct. 941, 92 L.Ed. 1236. However, it is not necessary to adopt or reject it in this case, in view of the Findings of Fact, infra.

Co. v. United States, 328 U.S. 781, 814, 66 S.Ct. 1125, 90 L.Ed. 1575. Neither rough competition nor unethical business conduct is sufficient. The requisite intent to monopolize must be present and predominant.[6]

 The intent must be to gain control over some relevant market sufficient to set prices in that market or to exclude competitors therefrom. An intent to exclude competitors from only part of the relevant market would not be sufficient to create liability for an attempt or a conspiracy, unless as plaintiffs contend in this case, defendants believed that by excluding the AFL from certain cities, e. g. Dallas and Minneapolis-St. Paul, they could effectively exclude it from the entire market, and acted with that specific intent as their preponderant motive.

### Relevant Market

The market which must be studied to determine whether a business organization has monopoly power will vary with the part of commerce under consideration. United States v. E. I. DuPont De Nemours & Co., 351 U.S. at 404, 76 S.Ct. 994, 100 L.Ed. 1264; International Boxing Club of New York Inc. v. United States, 358 U.S. 242, 249–51, 79 S.Ct. 245, 3 L.Ed.2d 270. See also United States v. National Football League, 116 F. Supp. at 323. The "part of the trade or commerce among the several States" involved in the present action is major league professional football. Essentially, the relevant market is nationwide; but because of the nature of major league professional football, there are several areas of effective competition between plaintiffs and defendants.

The competition for players and coaches is nationwide. The competition for the sale of TV or radio rights to networks or sponsors is essentially nationwide. The competition for attendance at games, and the competition between the telecast of a game from one city and the actual playing of a game in another city, is generally confined to the area in which the game is being played. The competition between the leagues for metropolitan areas in which franchises can profitably be located is the most important aspect of the competition in this case. This area of competition is essentially nationwide, embracing all cities and metropolitan areas which may reasonably be expected to support a major league professional football team. Consideration must also be given to the fact that at least six and probably eight teams are necessary for the successful operation of a league, and that only a few cities, at most, under present conditions, can successfully support two teams.

### FINDINGS OF FACT

#### Historical Background

Before 1946 the NFL and its members were the only persons engaged in major league professional football in the United States. A competing league, the All America Football Conference (AAFC), was organized in 1945 and operated through four seasons, 1946–1949, with teams in Brooklyn, Buffalo, Chicago, Cleveland, Los Angeles, Miami, New York and San Francisco. Baltimore replaced Miami in 1947. After the 1948 season the Brooklyn team merged with the New York team and the AAFC operated in 1949 with seven teams, but disbanded after that season. The Baltimore, Cleveland and San Francisco teams were admitted to the NFL,[7] raising the number of its teams to 13; shortly thereafter that number was reduced to 12, where it remained until 1960. All the NFL teams

---

6. Whether it would be sufficient if the evidence showed two motives, one legal and the other illegal, neither of which predominated over the other, need not be decided in this case, in view of the facts found below. See, however, Osborn v. Sinclair Ref. Co., D.Md., 171 F. Supp. 37, 44, n. 5, rev'd on other grounds, 4 Cir., 286 F.2d 832, cert. den. 366 U.S.

963, 81 S.Ct. 1924, 6 L.Ed.2d 1255. Cf. Times-Picayune Pub. Co. v. United States, 345 U.S. at 622, 627, 93 S.Ct. 872, 97 L.Ed. 1277.

7. Certain agreements were made with respect to other AAFC player contracts, which are not material here.

were located in different cities except the Chicago Bears and the Chicago Cardinals,[8] and all but one, the Green Bay Packers, in large metropolitan areas. Plaintiffs have not shown that the various agreements between the NFL and the AAFC involved any violation of the antitrust laws or that the monopoly power which plaintiffs claim the NFL possesses was illegally acquired.

After 1949, and until the organization of the AFL, the NFL and its members were the only persons engaged in the business of major league professional football in the United States, although a Canadian league has been in operation for some time and has engaged in active competition for outstanding players.

Most of the NFL teams were owned or controlled by one man, but a few had multiple membership and control. Many of the owners are colorful persons, notably individualistic, who often act for highly personal reasons. Their views on most subjects are apt to differ widely. League affairs are conducted largely by telephone between infrequent meetings.

During most of the 1950's, several of the NFL clubs were in financial difficulties or very weak in playing strength or both. Commissioner Bell and most of the owners felt that it would not be wise to increase the number of franchises until these problems were solved. Conditions improved steadily during the decade, and the owners who favored expansion became more insistent. Some felt that NFL teams would attract large crowds in various cities, especially Houston, Dallas, Miami, Minneapolis, Buffalo, St. Louis and Atlanta, and urged that plans be made to grant franchises to suitable owners in some of those cities. Others were influenced by the urging of Clinton Hester, an attorney and lobbyist for the so-called Sports Bill,[9] the purpose of which was to free professional football and other organized sports from certain features of the antitrust laws. Some, no doubt, feared the possible rise of another league, remembering the costly competition during the days of the AAFC, and some were disinterestedly eager to spread the game. On the other hand, some of the owners felt that it would be unwise to dilute their interest in the NFL and in their TV rights by adding clubs of unproved strength. One or two had personal reasons for opposing expansion, such as hoping to sell or transfer a franchise.

In January 1956 Halas, owner and coach of the Chicago Bears and senior member of the NFL, who was a strong proponent of expansion, predicted an enlargement of the NFL to 16 teams through successive grants of franchises to four additional cities during the period 1960 to 1965.

In July 1957 Commissioner Bell testified before a Congressional Committee which was considering the Sports Bill. He said that he believed the NFL would expand in the next few years, certainly by 1960, but he also said that he did not think expansion should take place until each of the NFL clubs achieved a certain won-loss record, which he thought would soon occur. This was not a commitment on behalf of the NFL, but similar statements were made from time to time by Bell and by various NFL owners, usually qualified by reference to the problems of the Cardinals and the Redskins, or to some won-loss ratio, which was not intended to be an absolute test, but was intended to express the belief that more nearly equal playing strength of the existing clubs was an important prerequisite to NFL expansion. By 1959 all the NFL clubs had the potential of achieving satisfactory won-loss records and were as nearly equal in playing strength as could be expected.

8. The latter team was shifted to St. Louis before the 1960 season.

9. Introduced as a result of the litigation which culminated in United States v. International Boxing Club of New York, Inc., 348 U.S. 236, 75 S.Ct. 259, 99 L. Ed. 290 (1955, jurisdiction), 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959, merits), and Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L. Ed.2d 456 (1957).

At the January 1958 annual meeting of the NFL, Bell appointed an expansion committee, with Halas as chairman. Marshall, an opponent of expansion, insisted that the committee be a committee of the whole, but Bell directed that Halas and Rooney, the earliest and most ardent advocates of expansion, function as a working committee. Although different members favored different cities and some were still opposed to any expansion, by 1959 a majority felt that there should be expansion to 16 teams sometime in the 1960's, two teams at a time. Apart from pressures generated by the Sports Bill, various business reasons moved the several NFL members to favor expansion. There was a general feeling that because of the growing interest in professional football and the healthier financial condition of the NFL teams resulting from the development of TV and other factors, expansion, particularly in the Southwest, was desirable and could be accomplished without weakening the league, in view of the approach to equality in the playing strength of the teams. Most of the owners felt that Houston and Dallas should be the first two cities, with Minneapolis, Buffalo and Miami the most favored candidates for later expansion.

An NFL franchise had operated in Dallas for the first half of the 1952 football season, but had failed and had been replaced by Baltimore. During the years 1952 to 1958, Clint Murchison, Jr. (Murchison), of Dallas, and his father had negotiated for the purchase of the San Francisco 49'ers, the Washington Redskins and the Chicago Cardinals, with the view of moving one of those NFL franchises to Dallas, but for one reason or another the negotiations fell through.

Among others who applied for NFL franchises in 1957 and 1958 were Lamar Hunt, of Dallas, Winter and Skoglund, of Minneapolis, and the Houston Sports Association (Cullinan, Kirksey and K. S. Adams, Jr.). Bell suggested to each of

them that they try to purchase the Chicago Cardinals and transfer that franchise. Each conducted unsuccessful negotiations with the Wolfners. Bell had told Hunt, Adams and Howsam in 1958 that he did not think the NFL would expand until 1961 at the earliest and told Skoglund that he did not think a franchise would be granted to Minneapolis, because the owners seemed to favor southern cities on account of the weather. These statements were not intended to and did not commit the league, but were made as friendly advice and expressions of opinion to several of a host of applicants for franchises who were continually visiting Bell.

Until January 1960 the bylaws of the NFL required a unanimous vote for the granting of any additional franchises. During 1958 and 1959 the NFL owners discussed the possible elimination of this provision, in view of the adamant opposition of the Redskins (Marshall) and the varying positions taken by the Cardinals (the Wolfners).[10]

Halas and Bell decided that the question of expansion should not be presented to the January 1959 meeting, so Halas reported that the findings of the expansion committee were incomplete and inconclusive.

### February–June, 1959, especially Dallas and Houston

In February 1959 Murchison conferred with Halas about a new franchise for Dallas. Halas told Murchison that he was in favor of the NFL expanding into Dallas and Houston in 1961 and told Murchison to get in touch with him in the Fall of 1959 about the formalities of applying for a franchise at the January 1960 meeting of the NFL. Halas reported this to Bell. Many of the NFL owners regarded Houston as the best location for a new franchise, provided the city would build its proposed new stadium and the Rice stadium would be available in the meantime. Dallas and Houston were a

10. During relevant periods the bylaws have provided that a bylaw can be amended by a $^{10}/_{12}$ vote at an annual meeting after specified notice, otherwise only by unanimous approval.

desirable combination for several reasons, including local rivalry, scheduling, size of the stadiums and apparent interest in football.

In February 1959 Rooney visited Houston to complete plans for a preseason game between the Steelers and the Bears which was to be played in Houston on August 29. With the approval of Bell, Rooney discussed NFL expansion plans for Houston with representatives of the Houston Sports Association, including Adams, and during a telephone press conference Halas stated that in his opinion the league was two years from expansion, because of the question what each present member would do to cooperate with the new clubs; that Houston, Miami, Dallas and Buffalo appeared to be the cities nearest ready; and that the Houston group seemed to be ready to go. Halas said that the team balance in the NFL was now good, and that his idea would be to add two additional clubs, try a 14-club league for a while, and if it was successful, expand to 16 clubs. He said that Murchison had been to his office "asking about a franchise". Halas repeated former references to "our thinking" that the years 1955 to 1960 were years of consolidation and "the years from 1961 through 1965 are the time we've set aside for expansion to new cities". Halas had no authority to make these statements, but was trying to bring pressure on the other members of the NFL to accept his views and to create good will for the August game. Rooney said that the cities he had heard mentioned were Houston, Minneapolis-St. Paul, Miami and Buffalo. In April Halas visited Houston for another press conference to stimulate the sale of tickets for the August game, and reiterated his previous statements. In May and June Cullinan and Kirksey of the Houston Sports Association had further conversations and correspondence with Halas and Bell about the prospects for a Houston franchise and were given encouragement.

*February–July, 1959, Hunt's Activities*

In the meantime Hunt, having been rebuffed in his efforts to purchase the Cardinals or obtain a new NFL franchise, began secretly to plan and organize a new league. He was then 27 years old, without experience in professional sports. He surveyed various cities and made tentative overtures to individuals who seemed likely prospects for becoming owners of franchises.

During February and March 1959 Hunt talked to Bell and Halas, indicating that his interest was to obtain an NFL franchise for Dallas. Bell told Hunt that when expansion of the NFL occurred it would undoubtedly be in groups of two cities, naming those most often discussed, and that Hunt might make a presentation at the meeting of the NFL in January 1960. Hunt also talked to Halas in the Spring of 1959. By June 1, 1959, Hunt had concluded that a new league was feasible; Adams had agreed to accept a franchise in the new league for Houston, and Howsam had agreed to accept one for Denver.

On June 3 Hunt met Bell and Donohue in Philadelphia. Hunt did not reveal his plans to the NFL representatives, and by his own admission was secretive and devious in his methods. On conflicting evidence, I find that Bell did not tell Hunt there was no likelihood of any NFL expansion, but probably did indicate that there were no plans for expansion in 1960. There is no evidence that Bell, Halas, Donohue or any other representative of the NFL at this or any other time was anything other than candid in the statements they made to Hunt or that they gave him any advice which they did not believe to be sound. On the contrary, they gave him much good advise about how to operate professional football teams and about how the NFL operated.

Following the June 3 meeting with Bell and Donohue in Philadelphia, Hunt proceeded actively with the formation of the AFL. During June he was in touch with prospective franchise owners in New York (Wismer), Denver (Howsam), Houston (Adams), Minneapolis (Winter, Boyer and Skoglund) and Buffalo (Wilson). At that time Hunt contemplated beginning with a six team league.

Hunt revealed his intention to organize a new league to the NFL on July 17, 1959, when he sent Davey O'Brien, a former NFL football player and associate of the Hunts, to see Bell. O'Brien reported to Hunt that Bell's attitude was friendly and that Bell was willing to meet with representatives of the new league at any time.

On July 28 Bell again testified before a Congressional Committee in support of the Sports Bill. In his testimony, he told the Committee about the proposed new league and suggested the cities in which he thought it might be expected to locate teams; he was not asked any questions about possible NFL expansion. He indicated that he and the NFL were in favor of a new league.

On June 29 Hunt and O'Brien visited Bell at his home near Atlantic City. Hunt told Bell that the new league desired to maintain a friendly relationship with the NFL. He proposed that Bell serve as a common commissioner of the AFL and the NFL, that the two leagues hold a common player draft, and that arrangements be made to black out television during home games in both leagues. Bell rejected these offers, but gave Hunt advice and information about television, drafting of players and other details of operation of a league. Nothing was said about possible NFL expansion.

*August–Early November, 1959,*
*AFL and NFL, especially*
*Dallas and Houston*

On August 2 or 3, in Houston, Hunt and Adams publicly announced the formation of the AFL and their relationship thereto. On the same day, Cullinan, chairman of the Houston Sports Association, told Halas that he was not in accord with Adams' action and that the Association still maintained its interest in securing an NFL franchise for Houston. Halas assured Cullinan that Houston was still in the NFL plans.

On or about August 7 Hunt offered Barron Hilton a franchise in the AFL for the Los Angeles area. Shortly thereafter, Hilton accepted the offer.

On August 14 representatives from Dallas, Houston, Minneapolis, Los Angeles, Denver, New York and Seattle held the first meeting of the AFL in Chicago. Hunt stated that his plans were predicated on either a six- or eight-team league. The group decided to proceed with the formation of the league, and issued a press release to that effect. All but the Seattle group committed themselves to accepting franchises.

In mid-August Field Scovell, president of the organization which sponsored NFL preseason games in Dallas, reported to Halas and other NFL owners that Murchison wanted a press statement concerning the NFL's expansion plans for Dallas, in order to be in a position to take up with Hunt the developing conflict in Dallas and to discuss playing dates with the Cotton Bowl representatives. Halas agreed that a public statement of this nature was desirable, and on August 29, after meeting with Cullinan and Kirksey, of the Houston Sports Association, and Murchison and Wynne (an associate of Murchison), and after discussing the proposed release with several NFL owners,[11] Halas and Rooney issued a press release, stating that the expansion committee would recommend at the next annual meeting that Houston be granted a franchise to begin play in 1961, provided an adequate stadium was available, and that Dallas would also be recommended for 1961. Murchison requested that his name not be included in the release. Halas also told the press that NFL owners favored amendment of the bylaws to eliminate the requirement of a unanimous vote for expansion, and suggested the names of various cities in which the NFL was interested, including Minneapolis-St. Paul.

Meanwhile, on August 22, the AFL had held its second organizational meet-

---

11. In addition to the Chicago Bears and the Pittsburgh Steelers, Halas had obtained the approval of the Los Angeles Rams, the Detroit Lions, the Baltimore Colts and the Philadelphia Eagles to this public announcement.

ing in Dallas. About that time representatives from Los Angeles, Dallas, Houston, New York, Minneapolis and Denver signed articles of association, stating that they contemplated commencing play in the 1960 season, with a minimum of six teams. Each of the clubs contributed $25,000 to be held in escrow as consideration for its franchise. Hunt stated that he had been contacted by groups from Vancouver, Seattle, Portland, Lincoln, Buffalo, Kansas City, St. Louis, Louisville, San Diego, New Orleans and Miami, and appointed himself, Wismer and Adams an expansion committee. A draft of the proposed constitution and bylaws was distributed.

In the latter part of August, Hilton asked Pauley's advice about accepting an AFL franchise for Los Angeles. Pauley (a part owner of the Los Angeles Rams) replied quite frankly that he did not believe there could be two professional teams in the same city without one or the other, or both, suffering financially. Later Pauley indicated that he thought Hilton could buy an interest in the Los Angeles Rams.

On August 18 Howsam visited Bell and discussed the various cities in the AFL, but nothing material was said or concealed.

On August 26 Wilson applied to Hunt for a Miami franchise in the AFL, but because the stadium there was not made available to him, Wilson agreed to accept a franchise in Buffalo, which was granted by the AFL at its October 28 meeting, conditioned on Wilson's being able to acquire a suitable stadium. On September 12 the AFL held its third organizational meeting in Beverly Hills, California, at which little of importance was accomplished, although each team was asked to put up a $100,000 performance bond.

During the first part of September, Hunt conferred with Murchison and Wynne, and Pauley conferred with Hilton and Adams about the problems created by the potential competition in Los Angeles, Dallas and Houston.[12] On August 31 Murchison had told Halas that Hunt had committed himself to the AFL and that Murchison would try to get Hunt out of the picture, but it is impossible to be sure which side initiated the conversations. It is certain that both sides were eager to find some solution to the problems. All of the AFL men, with the possible exception of Hunt, would still have preferred to have NFL franchises; many of them would have been satisfied with a substantial interest in an NFL franchise.

Commissioner Bell died on October 11, 1959. Before and after his funeral in Philadelphia the NFL owners discussed expansion. Halas reported to the other owners a request from Murchison that the date for NFL expansion into Dallas be moved up to 1960, in order that the NFL Dallas team might compete more effectively with the AFL Dallas team. Representatives of each club, other than Washington, voted in favor of expansion by the addition of two teams in 1960. Several clubs had doubts or reservations which they were persuaded to abandon. On October 19 Halas issued a press release, which stated that the NFL would expand by two teams in 1960 and two more teams in 1961 or 1962, and that one team would be placed in Dallas in 1960 and another in Houston, if Houston offered an adequate stadium. This press release was approved by owners of 10 NFL teams and received wide publicity.

On October 25, at a meeting between Murchison and Hunt, arranged by a mutual relative, Murchison repeated his suggestion that the matter be settled by granting NFL franchises to Dallas, Houston and Minneapolis, and a fourth to Wilson, to be located in Miami rather than Buffalo. Murchison had previously offered to share an NFL franchise with

12. This case presents many striking examples of the fact that most men remember very little of conversations held two or three years ago, mainly those parts which seemed important to them at the time, and reconstruct the rest based on what they think they should have said and therefore must have said.

Hunt, and on this occasion offered to relinquish all interest in the Dallas NFL franchise so that Hunt could take full ownership. Hunt refused the offer, stating that he was committed to other AFL cities and owners.

Late in October and early in November Hunt, Murchison and Rosenbloom met in New York. Thereafter, Hunt, Adams and Skoglund discussed the possible granting of NFL franchises to Adams and Hunt and arranging in some way to take care of other AFL owners through franchises in the NFL. Hunt then went to California to see Halas, and soon afterwards Hunt, Adams, Howsam and Halas met in Chicago. During these conversations efforts were made to work out the problems by expanding the NFL and granting new franchises to various franchisees in the AFL, including Hunt, Adams and the Minneapolis group. The NFL refused to consider more than four new franchises and refused to consider placing a team in Denver. The negotiations ended without agreement. Anderson offered to assist Wilson, who was also a stockholder in the Detroit Lions, in obtaining an NFL franchise in Miami, but nothing came of it. These meetings were sought and welcomed by both sides. In the meantime, Hunt was pressing his efforts to have a common player draft and a television black out arrangement, the legality of which he knew was doubtful at best. Those efforts were rejected by the NFL owners.

On October 28 the AFL held its fourth meeting in New York. Various cities were discussed as the possible eighth franchisee. No decision was reached on this point or on the choice of a commissioner. It was announced that only Dallas and Houston had posted their $100,000 performance bonds. The constitution and bylaws were approved, to be signed at the November 22 draft meeting.

Boston had been one of the cities discussed at the October meeting of the AFL. Around November 10 Sullivan applied to Hunt for an AFL franchise for Boston. After talking the matter over with some of the other owners, Hunt told him that he would be granted a franchise, and Sullivan attended the November 22 meeting in Minneapolis. There, at the insistence of the Minneapolis group, a formal vote admitting Boston was taken.

On October 29 it was publicly disclosed that the NFL would be unable to obtain use of the Rice stadium in Houston pending construction of the proposed new Houston stadium.

### November 1959–January 1960, Minneapolis-St. Paul

The twin cities of Minneapolis and St. Paul had a long history of interest in NFL football. Johnson, sports editor of the two leading Minneapolis newspapers, had attended many NFL meetings and had urged a franchise for Minneapolis on Bell, Halas and any other NFL owner who would listen to him. Johnson had aided in the drive for the construction of the new Minneapolis stadium, built in 1956, with plans for expansion in the event of the acquisition of a major league baseball or football team, and had organized a group to sponsor two NFL regular season games in Minneapolis in 1959. Johnson's employer was a large holder of stadium bonds. Haugsrud, of Duluth, who long ago owned the Duluth Eskimos' franchise in the NFL and had been assured of consideration if the NFL expanded into Minnesota, cooperated with Johnson. Winter, a former owner of the Minneapolis Lakers' franchise in the International Basketball Association, Boyer, president of the Minneapolis Chamber of Commerce, and Skoglund, president of an insurance company, had also been interested in obtaining a new NFL franchise for Minneapolis or securing the transfer of the Chicago Cardinals' franchise to that city.

During October 1959, Boyer, who with Winter and Skoglund had put up the $25,000 for an AFL franchise in Minneapolis, sought information from Halas about the possibility of the NFL coming into Minneapolis in 1960, 1961 or 1962. A few days later Wolfner, of the Chicago

Cardinals, advised Skoglund not to continue in the AFL because the NFL was planning to expand into Minneapolis. About November 1, after it appeared that an NFL franchise would not be granted to Houston, Johnson was again in touch with Halas and Halas was in touch with the other NFL owners, most of whom agreed with Halas that Minneapolis should replace Houston as one of the first two cities. During the week preceding the Cardinals-Giants game in Minneapolis on November 22 (which was also the date and place fixed by the AFL for its draft meeting), Johnson called Halas and requested written assurance that the NFL would grant a franchise to Minneapolis in order to convince "some doubting Thomases". Johnson specifically mentioned Skoglund and Boyer. Halas had been informed that the Minneapolis AFL group would have to post a large performance bond at the draft meeting on November 23. On November 19 Halas and Wolfner telegraphed Johnson as follows: "In response to your request of last Monday, we contacted 11 clubs including undersigned and 10 clubs including undersigned indicated that when put to a formal vote they would be in favor of expansion program to include a franchise to Minneapolis-St. Paul prior to the 1960 season, provided suitable stadium available." This telegram was not publicized but was shown to the other interested persons in Minneapolis.

On November 21 Winter called Halas and requested a telegram, as firm as possible with respect to the grant of an NFL franchise to Minneapolis. Winter said he wanted such a telegram to show to Skoglund and Boyer. He requested that the telegram spell out the conditions under which the franchise might be granted, and he and Halas discussed the specific language to be contained therein. On November 21 Skoglund told Wolfner and Johnson that he and Boyer would remain in the AFL. Johnson told Wolfner that he had attempted to convince Skoglund and Boyer to join the NFL franchise group. All of this was reported to Halas, who, on November 22, sent the following telegram to Winter: "As stated in our telegram of November 19 to Charles Johnson, 10 clubs indicated they would vote for Minneapolis-St. Paul franchise for 1960 season. The cost of the franchise would be $600,000 payable $200,000 a year for three years, your team to receive 36 experienced players from roster of our clubs."

Prior to November 22 Skoglund, Winter and Boyer had attended all AFL organization meetings; Skoglund was a member of the committee to choose a commissioner; Boyer was a member of the constitution and bylaws committee; and Winter had set up the method whereby the AFL was going to draft its players and had supervised the arrangements for the holding of the draft meeting. They had had some negotiations for a lease of the stadium and each had put up one-third of the $25,000 deposit. They had, however, employed no general manager, players or coaches and had not posted the $100,000 performance bond.

Winter's intentions in November are not clear. He had signed the articles of association of the AFL in August because his contacts with the NFL representatives had led him to believe that NFL expansion to the Twin Cities was some years away and because there was an immediate possibility of an AFL franchise. He was willing to risk his one-third share of the $25,000 deposit with the AFL to assure his connection with whichever form of professional football came to Minneapolis, but he preferred to participate in an NFL franchise. Winter had initiated frequent contacts with Halas and Rooney between September 1 and early November, and had been told that the Twin Cities would probably join Dallas in the first round of NFL expansion if the NFL encountered stadium difficulties in Houston. After the announcements relating to the NFL stadium difficulties in Houston, Winter was unwilling to make further financial commitments to the AFL. Winter's continued interest in securing an NFL franchise for the Twin Cities was known to Boyer and Skoglund and was discussed

with them on a number of occasions during the Fall of 1959.

None of the contacts between representatives of Minneapolis and representatives of the NFL during the Fall of 1959 were initiated by NFL representatives. However, at the time Halas sent the telegrams on November 19 and 22, he knew that Winter, Boyer and Skoglund were associated with the proposed AFL franchise for Minneapolis and that they were expected by the AFL to put up a $100,000 performance bond at its November 22–23 meeting and that the player draft was to be conducted by the AFL at that time.

The contents of the November 22 telegram were made known to the AFL owners on the evening of November 22. Johnson had caused the contents of the telegram to be published in the Minneapolis paper which came on sale that evening. The meeting opened in a turmoil, during which Wismer made personal remarks about Winter, which caused Winter to withdraw from the meeting. Skoglund and Boyer announced their intention to continue to participate in the organization of the AFL franchise, and they participated in the draft. They stated that they would not post a performance bond until a stadium lease had been signed. The following day Skoglund and Boyer repeated their intention to remain in the AFL and stated that Winter was still a part of the team. Shortly after November 22, the Minneapolis Stadium Commission told Skoglund and Boyer that they would not be given the stadium lease until after it was determined whether there would be an NFL team in Minneapolis.

The situation during December is confused. Winter had lost interest in the AFL; he wanted a part of the NFL franchise and asked Halas for a form on which he could apply.

On December 29, 1959, Skoglund, Boyer, Winter and Foss attended a meeting with representatives of the Minneapolis Stadium Commission and bondholders, called at Foss' request, for the purpose of determining whether the AFL franchisee could secure a lease of the Minneapolis stadium. Winter opposed a decision until after the January 1960 meeting of the NFL. The stadium representatives stated that no lease would be granted to the AFL until it was determined whether an NFL franchise would be awarded to Minneapolis-St. Paul. The next day Skoglund and Boyer asked to be allowed to withdraw from the AFL. Foss agreed, because he did not believe it was possible for them to proceed, and a few days later their $25,000 was returned to them.

On January 11, 1960, Haugsrud submitted a formal application to the NFL for a franchise for Minneapolis-St. Paul, signed by himself and Winter. On January 18 Boyer and Winter made a formal presentation to the NFL owners on behalf of Minneapolis. Boyer stated that he had withdrawn from the AFL and had obtained a complete release and a return of the $25,000 deposit. He also stated that the Minneapolis stadium was being held for an NFL franchise.

### December 1959-on—AFL and NFL

Before December 1959 and January 1960 Hunt sent his attorney to see a number of NFL owners and sometimes accompanied him (1) to try to persuade the owners not to grant a franchise to Dallas, and (2) to collect evidence which might be helpful in an antitrust suit against the NFL and its owners, which Hunt had been contemplating for some time. It is remarkable—and characteristic—how many of the owners were willing to talk to Hunt's attorney without having their own attorneys present. The court does not accept all of the testimony of Hunt's attorney with respect to what was told him, but finds that the NFL owners generally stated their differing views with respect to expansion, which have been set out above. Marshall, of the Washington Redskins, repeated what he had said before and later said again publicly: " * * * the only reason for expansion I have heard from other owners is that we would destroy the new league". Marshall had been a militant opponent of expansion, based, in

part, on his desire to avoid dilution of NFL ownership, his belief that the league was not sufficiently stabilized for expansion, his concern over the effect of expansion on college football, his desire to avoid dilution of his television interests and, particularly, a personal animosity toward one of the men associated with Murchison in seeking the Dallas franchise who had acquired an interest in the Redskins' marching song. Marshall was doing everything possible to block the expansion, which was to be voted upon at the January 1960 meeting. His quoted statement was not true because he had heard many different reasons for expansion from the NFL owners. Plaintiffs concede that Marshall was not a conspirator, and, of course, his statement could not have been in furtherance of the objects of the alleged conspiracy.

At the January 1960 meeting of the NFL the bylaws were amended to require only a $10/12$ vote for expansion.[14]

On January 28, 1960, Murchison agreed to have his associate transfer to Marshall all rights in the song "Hail to The Redskins" and agreed to indemnify Marshall against loss resulting from any suits brought because of the admission of Dallas into the NFL for the 1960 season. As a result, Marshall agreed to vote for the admission of Dallas. On the same day a franchise was granted to the Murchison group in Dallas for the operation of an NFL franchise in 1960.

A franchise was also granted to Minneapolis-St. Paul for operation in 1961, provided 25,000 season tickets were sold in advance of the 1961 season and the stadium was enlarged to seat a minimum of 40,000. The franchise was awarded to the Twin Cities, the ownership group to be worked out with the assistance of Johnson and others, subject to the approval of the NFL Commissioner and the

member clubs. The actual ownership of the Minneapolis Vikings' franchise, as approved by Commissioner Rozelle in July 1960, was formulated in the Spring of 1960 under the guidance of Johnson. Winter, Boyer and Skoglund each received a 20% interest, Ridder, of St. Paul, 30%, and Haugsrud, 10%.

At the annual meeting of the AFL on January 29, 1960, Hunt reported that two definite bids and several tentative bids had been received for the eighth franchise in the AFL. Applicants from three cities attended the meeting. Oakland was selected largely because the AFL owners wished to establish a second team on the West Coast, to stimulate a rivalry with Hilton's team, and because it was a promising location for a franchise. Arrangements were made for Oakland to play in San Francisco pending completion of the Oakland stadium.

### 1960–1961. Oakland, Minnesota and General

The owners of the Oakland franchise were slow getting under way, and were plagued for a time by internal dissension. Other AFL teams had signed some of the players drawn by Minneapolis in the draft; most of these were transferred to Oakland but several of the best were traded for other players. Nevertheless, Oakland won six and lost eight games in 1960 and finished third in its division and fifth in the overall standing.

The bylaws of the AFL provide that a visiting team shall receive $20,000 with an option to take 40% of the net gate receipts (after certain deductions) of each game in which it participates. Out of 56 games played in 1960, only four games (two in Boston and two in Buffalo) returned more than $20,000 to the visiting team. The total amount of such excess was $7,250.[15] The Oakland team drew badly both at home and on the road, despite a better playing record than

14. The owners, however, retained the provision requiring a unanimous vote if the applicant for a franchise intends to place a team in a city in which membership is already held or within 75 miles of such a city.

15. To date no visiting team has received more than the minimum $20,000 guarantee for any regular season game played in Dallas, Los Angeles, New York City or Oakland.

some teams (e. g. Boston and Buffalo) which drew better on the road as well as at home. It is difficult to interpret the attendance figures, either for 1960 or 1961, when the league as a whole had greater success.

The wisdom of delaying until 1961 the activation of the NFL franchise in Minnesota was proved by the events. The hastily assembled NFL Dallas Cowboys had a disastrous season in 1960, financially as well as on the field. On the other hand, the first (1961) season in the Twin Cities was quite successful. The stadium had been enlarged from 22,000 to 40,000 seats. As the result of skillful promotion extending over nearly two years, 25,000 season tickets had been sold. The NFL Minnesota Vikings began operations with experienced management recommended by Commissioner Rozelle, a highly publicized coach, and name players obtained in part from other NFL teams and in part from participation in the 1960 draft, for which the Vikings had had ample time to prepare.

An AFL team in Minneapolis would not have had comparable success. The newspapers wanted an NFL team, although they would probably have rallied eventually to the support of an AFL team. It is doubtful whether the AFL could have persuaded the stadium authorities to increase its capacity above the existing 22,000 unless and until they showed the need for more seats. Indeed it is doubtful whether all of the three AFL franchisees really intended to go ahead with their AFL franchise. At the time of the November telegrams and meetings they had no general manager or coach, no stadium lease, and had neither posted the $100,000 performance bond nor made any other significant business commitment. Minneapolis was a good football town, devoted to its University of Minnesota Gophers, and a strong supporter of the NFL games which had been played there, but whether an AFL team would have been successful, and if so, how many years it would have taken, is doubtful.

During the Spring of 1960 the AFL considered expansion. In the Spring of 1961 it believed that by the conclusion of the 1961 season the caliber of AFL play would be equal to that of the NFL, and challenged the NFL to an interleague play-off. The 1961 official publication of the AFL asserted that never before in the history of sports has a sports organization gone so far so fast.

### Players and TV

The NFL has avoided competition among its teams for outstanding college players by its player selection system, sometimes called a draft. Such a system is probably necessary for the successful operation of a league. The AFL adopted a similar system.

The NFL has minimized competition between attendance at its games and telecasts of other NFL games by prohibiting the telecasting of NFL games into a city where an NFL game is being played. Judge Grim found this arrangement reasonable and legal, although he found that other restraints on TV violated the antitrust laws. 116 F.Supp. at 326, 330. The AFL adopted a similar policy.

On several occasions during the late Summer and Fall of 1959, Hunt, on behalf of the AFL, sought an agreement with the NFL which (1) provided for a common player draft and (2) would have prohibited the telecasting of any game of either league into a city whether either an NFL or an AFL game was being played. This would have seriously restricted if not entirely eliminated the telecasting of "away" games of the New York, Los Angeles, and Dallas teams back to those cities, and would have otherwise seriously diluted the value of the TV rights. Moreover, both proposals were of doubtful validity, at best, although plaintiffs contend that a common player draft would be a reasonable restriction on commerce, for reasons which need not be elaborated here. Both proposals were promptly and repeatedly rejected by the NFL owners.

For many years most of the NFL games have been telecast over the CBS

network through arrangements made by the teams or their sponsors. On or about March 30, 1960, Pittsburgh and Baltimore reached an agreement with NBC for nationwide telecasts of their regular season games. This arrangement was opposed by the other NFL teams and by Commissioner Rozelle, and was detrimental to other NFL clubs as well as to the AFL clubs. Plaintiffs concede that this action was not taken with the specific intent to injure the AFL and its members.

The TV arrangements of the AFL were handled by an organization inexperienced in dealing with sports promotion. After presenting unsatisfactory plans to ABC and NBC, the AFL made a very profitable deal with ABC, which had been negotiating with Hunt since the middle of 1959.

### Monopoly Power

■ Plaintiffs contend that defendants had the power to prevent or exclude competition by plaintiffs in the business of major league professional football. As we have seen, the principal areas of competition are for (1) a sufficient number of cities capable of supporting teams to form a practicable league, (2) players, and (3) the sale of TV rights.

(1) *Cities.* There are many cities in the United States capable of supporting competently managed major league professional football teams. Hunt testified that in his opinion a metropolitan area of 500,000 or more with proper management and under the right circumstances will support such a team. On all the evidence a figure of 700,000 appears more reasonable. There are 52 metropolitan areas in the United States with a population over 500,000, of which 31 have more than 700,000, and 24 more than 1,000,-000.

Aside from population, the material factors in determining whether a city is a suitable location for a professional football franchise include an adequate stadium, available financial backing, weather, fan enthusiasm, and proximity to another professional football team or other competing sports.

Some problems, such as stadium inadequacies, can often be resolved once the probability of obtaining a professional football franchise has been sufficiently established. For example, Oakland and Houston are in the process of constructing new stadiums; Minneapolis and San Diego expanded the seating capacity of their existing stadiums.

It is doubtful whether under present conditions any cities except possibly New York and one or two other large metropolitan areas can support two teams. The AFL, however, had no difficulty in finding owners for the franchises Hunt wished to place in New York and Los Angeles, and had applications from several other NFL cities. There is no reason to believe that the Oakland club will not be successful, once its stadium is completed, although it is located in the San Francisco Bay area, where it must compete with the NFL 49'ers.

The owners of a franchise must be prepared to absorb a large initial loss; profit projection is speculative and eventual profits are usually small. Naturally most investors would prefer to have a franchise in an established, financially successful league rather than in a newly organized unproved league. However, the lure of owning a successful team is very attractive to many rich men, as well as to sports promoters; witness the applications received by the AFL from Vancouver, Seattle, Portland, San Francisco, San Diego, Newark, Buffalo, Kansas City, St. Louis, Louisville, New Orleans, Miami and Atlanta, as well as from the eight cities originally selected, plus Oakland.

Fan enthusiasm may be built up over the years; poor college football towns may be developed into loyal supporters of a professional team, e. g. Baltimore, where it has also been shown that established competing attractions, such as horse racing, are not fatal. Plaintiffs have failed to show any lack of sufficient, qualified applicants for franchises to support a second league.

No doubt the NFL could have forced the AFL out of any particular city except New York and possibly one or two other very large cities, plus Dallas and Houston, where rich owners are determined to fight it out. But it was not financially practicable for the NFL to expand into all of the cities in which the AFL might place teams. There is no evidence that the NFL has ever contemplated more than 16 teams, and it is probably not feasible to operate a larger league. Even during 1959, after the AFL was organized, the NFL owners were unwilling to weaken their own league by expanding into any area which they did not believe would prove a suitable addition to the NFL.

Plaintiffs suggest that defendants had the power to add enough new cities to the NFL to destroy the AFL, and after having destroyed it, to drop the cities the NFL did not want. But the NFL did not have the resources to add more than two new teams at once nor more than four new teams within the next five years without so weakening the existing clubs as to make such action undesirable and not practically possible.

(2) *Players*. In 1959 the NFL had most of the ablest players under contract. However, colleges graduate annually large numbers of talented players, and, because after the season starts professional football rosters are usually limited to around 35 players, many good players are released each year after the training season and are available to be signed by clubs in any league. Moreover, NFL players become free agents after a period of years.

By March 1960, the AFL clubs had submitted 365 player contracts to the AFL commissioner for approval, and an estimated 668 players had signed contracts with one of the AFL teams. Plaintiffs were able to compete successfully with the NFL and with the Canadian League for the services of many highly qualified players. AFL clubs signed six of the 12 first choices of the NFL teams in the 1959 draft, and competition from the AFL and the Canadian League deprived two NFL clubs of the services of more than half of their first 10 draft choices.

The NFL has no power to prevent the AFL from signing an adequate number of qualified players.[16]

(3) *TV*. The evidence shows that defendants did not have the power to exclude plaintiffs from adequate television outlets.

\*

The AFL admits that it has been notably successful in its operations, and gives promise of increasing success. Like the NFL, it has an expansion committee.

Defendants did not have the power to prevent or unreasonably to restrict competition. Therefore, they are not liable on the claim of monopolization.[17]

*Intent*

Since defendants did not have monopoly power, plaintiffs must rely on their claims that defendants attempted or conspired to monopolize. To recover on either of those claims plaintiffs must show that some acts were done or some course of action undertaken with the specific intent to destroy the AFL as a competitor.[18]

The acts relied on by plaintiffs are the offering and granting of franchises to

16. Undoubtedly for the first few years the NFL will have a larger number of players with great reputations, whom the fans throughout the country would most like to see play. However, since the average playing span in the NFL has been estimated at about five years, it is reasonable to expect that the level of play in the two leagues and the consequent fan appeal will be more nearly equal after five years or so than it was during the first year.

17. See Elements of Offenses Charged, supra. If defendants had possessed monopoly power, even though legally obtained, the awarding of the franchise to Dallas for operation in 1960, and the offer of the franchise to Minneapolis in November 1959, might well have been such acts as would have imposed liability for monopolization.

18. See cases discussed under Elements of Offenses Charged, supra. Plaintiffs must

Dallas and Minneapolis and the conditional offer of a franchise to Houston, at the times and under the circumstances those acts were done. To prove the requisite intent, plaintiffs rely particularly on (a) the August 29, 1959, announcement with respect to Dallas and Houston, (b) various proposals and suggestions made by NFL owners to AFL owners between September and November 1959, and (c) the statements and telegrams in November 1959 with respect to the Minnesota franchise.

(a) The announcement on August 29 that the committee would recommend the grant of franchises to Dallas and Houston to begin play in 1961 was in line with the general plan for the expansion of the NFL during the years 1961–1965, which had been agreed upon by most of the owners before the AFL was contemplated. As we have seen, various motives induced the several owners to go along with these plans. Some were attracted by the great enthusiasm for football in Texas, the size of the Cotton Bowl in Dallas, and the Rice Stadium and plans for a municipal stadium in Houston. The Philadelphia Eagles wanted a 16-team league with two eight-team divisions. Some felt that the good of the league, as well as the good of the sport in competition with other sports, called for expansion into areas that were clearly ready, as soon as the financial and playing strength of the NFL clubs made it feasible to stock new clubs with players, and they were being urged to do so by Hester, the attorney who was lobbying for the Sports Bill. Weather, local rivalry and scheduling convenience also made the two cities in Texas an attractive pair.

At the request of Murchison, in October 1959, the effective date of the Dallas franchise was advanced one year, from 1961 to 1960, in order to permit the NFL team to start at the same time as the AFL team. This was done for business reasons, i. e. to enable the NFL team to compete more effectively with the AFL team in Dallas for season ticket sales, choice of dates in the Cotton Bowl, newspaper support and the like.

Plaintiffs note that several of the NFL owners told Hunt's attorney that they did not believe Dallas could support two teams. That does not prove that their predominant intent in granting a franchise to Dallas, or advancing the playing date to 1960, was to destroy the AFL. Their views were at least equally consistent with their claimed desire to strengthen Murchison's competitive position as against Hunt's Dallas AFL team, so that the NFL team would have a better chance to survive.[19] Although some of the NFL owners may have felt that this competition might discourage the AFL from continuing its team in Dallas or even from continuing operations as a league, this was not a predominant or principal motive in granting the franchise or advancing the date.

(b) Pauley and Murchison were particularly anxious to avoid competing teams in their respective cities (Los Angeles and Dallas), and many of the meetings and proposals during the Fall of 1959 arose out of the desire of those NFL owners to find a solution for their special problems. Their efforts were encouraged by some of the other NFL owners and were welcomed by many of the AFL owners, who really wanted franchises in the NFL, and in most instances would have been satisfied with a share in such a franchise. All of the owners, AFL as well as NFL, were anxious to avoid costly competition in signing players. The offers and suggestions of the NFL owners were not made with any predominant intent to destroy the AFL,

also, of course, show some injury from those acts.

19. Even if the AFL should be forced to withdraw from Dallas, there is no showing that such withdrawal would prevent the continuance of the AFL as an effective league. After competing with the Rams in Los Angeles for a year, the AFL Los Angeles team was moved to San Diego with considerable success.

but as part of the effort being made by both sides to find solutions to their mutual problems.

(c) After it was clear that the Rice Stadium in Houston would not be made available to the NFL, most of the owners agreed that Minneapolis-St. Paul should replace Houston as one of the first two franchises to be granted in accordance with the expansion policy to which all but Marshall had agreed. Undoubtedly; the November telegrams were sent at the request of Johnson and Winter to persuade Winter's associates, Boyer and Skoglund, to give up the AFL franchise, so that the NFL could come into the Twin Cities without competition there. It was obvious that Minneapolis-St. Paul could not support two teams, and the NFL wanted to have a successful team there. As in the case of Dallas, that was a business reason, different from an intent to destroy the new league. The evidence does not support plaintiffs' contention that an intent to destroy the AFL was a predominant motive of defendants.

＊

█ If the NFL had had monopoly power, the course of action followed by the NFL owners might have been sufficient to create liability for monopolization, which does not require proof of specific intent; but the actual motives and intent were not such as would support liability on the claim of attempt to monopolize or the claim of conspiring to monopolize.

### Injury

*Houston.* As a result of the expansion statement made by Halas on August 29, 1959, Adams changed his arrangement with the Houston Public School System for the lease of Jeppersen Stadium from a one-year lease at $3,000 per game, the lessee to have the parking concession, to a three-year lease at $4,000 per game, the lessor to have the parking concession.

*Dallas.* The granting of an NFL franchise to Dallas, which began play at the same time as Hunt's AFL team, undoubtedly has been costly to the AFL team, and may have prevented the attendance at some of the games there from passing the guarantee point, although that is doubtful because interest in and attendance at both NFL and AFL games in Dallas has been disappointing, and may indicate that the city is not as good a location for a professional football team as was generally believed.

*Minneapolis.* Plaintiffs' claim of injury with respect to Minneapolis is based primarily on the theory that the acts of the NFL owners required the AFL to substitute an inferior Oakland franchise for a more desirable franchise in Minneapolis. It is claimed that this substitution. resulted in reduced income to the AFL and its members from both home and road games, and that other AFL clubs suffered a loss of valuable property rights from having to stock the Oakland franchise with players.

The first of these propositions is doubtful, for the reasons stated above under the heading "1960–1961. Oakland, Minnesota and General". Whatever injury there may have been was contributed to by unskillful handling of the Oakland arrangements. The transfer of four or five players from each of the other clubs to Oakland probably caused some injury to the other teams, offset in a few instances by acquiring and retaining well-publicized or favorite players from the Minneapolis draft list.[20]

### Unclean Hands

█ Defendants contend that plaintiffs are barred from equitable relief by the doctrine of unclean hands. It is true that Hunt was not entirely candid

---

20. There is no basis for a finding that the abandonment of Minneapolis by the AFL deprived the AFL of an additional $25,000 franchise fee. The record fails to establish that the AFL either desired or was capable of operating with nine teams in 1960. The Oakland plaintiff concedes that it can claim no injury from any action of the NFL owners in causing the AFL to withdraw from Minneapolis.

with Bell and was devious in his dealings with some of the NFL owners, but that is a far cry from such conduct as would amount to unclean hands. Hunt and many of the other AFL owners were eager to become a part of the alleged monopoly, and also proposed to the NFL that they join in agreements of doubtful validity to keep down the amounts they would have to pay the players and to place restrictions on telecasting. Those acts of Hunt and other AFL owners would not prevent recovery under the doctrine of Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, at 215, 71 S.Ct. 259, 95 L.Ed. 219, and Union Leader Corp. v. Newspapers of New England, Inc., 1 Cir., 284 F.2d 582, at 586–87, although they might properly be considered in determining the equitable relief which might be granted if defendants were guilty of any violation of the laws which would render them liable to plaintiffs.

### Conclusions

1. This court has jurisdiction over the defendants and the subject matter of this action.

2. Neither individually nor in concert have the defendants monopolized any part of the trade or commerce among the several states; particularly they have not monopolized major league professional football.

3. None of the defendants has attempted to monopolize or combined or conspired with any other person or persons to monopolize major league professional football.

4. None of the defendants has engaged in a combination or conspiracy in unreasonable restraint of trade or commerce among the several states in the presentation of major league professional football games.

5. None of the plaintiffs is entitled to relief in this case against any of the defendants.

Judgment will be entered in favor of the defendants, with costs.