**UNITED STATES of America, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION and Ford Motor Company, Defendants.**

**Crim. No. 47140.**

United States District Court, E. D. Michigan, S. D.

Jan. 14, 1974.

Dwight B. Moore and Robert M. Dixon, Dept. of Justice, Cleveland, Ohio, for plaintiff.

Fred H. Bartlit, Jr., Chicago, Ill., Ross L. Malone, General Motors Corp., Nathan B. Goodnow, Detroit, Mich., for General Motors.

William Piel, Jr., New York City, Robert W. Scott, Ford Motor Co., Dearborn, Mich., George E. Brand, Jr., Detroit, Mich., for Ford.

## MEMORANDUM OPINION

FEIKENS, District Judge.

Defendants are charged with conspiracy to fix prices in the automobile fleet market (Count I) and conspiracy to monopolize that market (Count II) in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Among the unindicted co-conspirators are the National Automobile Dealers Association (NADA) and Peterson, Howell and

---

Heather (PH&H), an automobile leasing company.

The automobile fleet market is composed of three sub-markets: the daily rental company, the commercial fleet and the government (state and local) fleet. During the 1960's, Ford, General Motors and Chrysler made substantial discounts in order to induce sales in these markets. However, in April of 1970, both Ford and General Motors announced the eliminations of price concession programs in the government fleet market. Then in May of 1970, General Motors announced the elimination and Ford announced a substantial reduction of price concession programs in the remaining fleet markets.

In its indictment the government alleged that these decisions were the result of a tacit agreement between Ford and General Motors and the co-conspirators. The government alleged that this agreement was reached with the aid of, and at the behest of NADA and PH&H, both of whom had been most vocal in their opposition to fleet programs and the government contends that these organizations served as conduits for signals between the defendants, and that it was through them that the agreement was reached.

The case was tried to a jury. At the close of the testimony, the defendants brought motions for dismissal of Count II for failure to allege specific intent, an element of the offense, and for judgments of acquittal on both counts because of insufficiency of evidence. The motion for dismissal of Count II was denied on the ground that the defendants were entitled to relief on their motion for judgment of acquittal.

This opinion supplements the court's bench opinion granting the defendants' motion as to Count II.

### I.

During oral argument on this motion, the parties disagreed as to the "specific intent" requirement in a conspiracy to monopolize charge. Nevertheless, both cited American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), in support of the proposition that the intent required is the intent to control prices or exclude competition. The court is of the opinion that this intent is more than a general intent, as for instance, the intent in a conspiracy to fix prices. The government must prove in addition that the conspirators agreed to fix prices *for the specific purpose* of acquiring or maintaining monopoly power.

"Relatively early in the history of the Act—1905—Holmes, J., in Swift & Co. v. United States, supra, (196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518), explained this aspect of the Act in a passage often quoted. Although the primary evil was monopoly, the Act also covered the preliminary steps, which, if continued, would lead to it. These may do no harm in themselves; but if they are initial moves in a plan or scheme which, carried out, will result in monopoly, they are dangerous and the law will nip them in the bud. For this reason conduct falling short of monopoly, is not illegal unless it is part of a plan to monopolize, or to gain such other control of the market as is equally forbidden. To make it so, *the plaintiff must prove what in the criminal law is known as specific intent; an intent which goes beyond the mere intent to do the act.*" United States v. Aluminum Co. of America, 148 F.2d 416, 431–432 (2d Cir. 1945). (emphasis added).[1]

The Court of Appeals for the Sixth Circuit has held to the same effect:

"Section 2 of the Sherman Act makes it illegal to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states.' Of the three courses of conduct pro-

1. The *Alcoa* decision was approved by the Supreme Court in American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

scribed by this section, we are here concerned with only the third, that of combining or conspiring to monopolize trade. Unlike the substantive offense of monopolization, where it need be established that a company has monopoly power (power to fix prices and exclude competitors) coupled with a general or deliberate intent to exercise that power [citing cases] *a specific intent to accomplish that unlawful result is necessary where monopoly power has not been obtained and the charge is an attempt or conspiracy to monopolize.*" Lewis v. Pennington, 400 F.2d 806, 811 (6th Cir. 1968), cert. denied, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968) (emphasis added).

*See also* United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L. Ed. 1533 (1948); United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1971); American Football League v. National Football League, 323 F.2d 124 (4th Cir. 1963); United States v. International Boxing Club, 150 F.Supp. 397 (S.D.N.Y.1957); United States v. Chas. Pfizer & Co., 367 F.Supp. 91 (S.D.N. Y., decided November 30, 1973).

In support of its contention that "specific intent" is not an element in the crime of conspiracy to monopolize, the government cites language in United States v. Hilton Hotels Corp., 467 F.2d 1000, 1005 (9th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1974):

"Specific intent is not an element of any offense under the Act except attempt to monopolize under section 2 . . . ."

This statement is clearly dictum. The defendants in that case were charged under Section 1 of the act, not Section 2. In rejecting the defendants' arguments, the court of appeals held that specific intent was not an element in the crime of conspiracy to restrain trade. The court's statement with respect to the crimes of which specific intent is an element was unnecessary to decision.

■ This court holds that "specific intent" to acquire monopoly power (the power to fix prices or exclude competitors) is an element in the crime of conspiracy to monopolize in violation of Section 2 of the Sherman Act.

## II.

In ruling on the defendants' motion for judgment of acquittal, the court employs the standard announced in United States v. Conti, 339 F.2d 10, 13 (6th Cir. 1964):

"In testing the sufficiency of the evidence to withstand a motion for judgment of acquittal, the trial judge does not pass upon the credibility of the witnesses or the weight of the evidence. On the contrary he must view the evidence and the inferences that may be justifiably drawn therefrom in the light most favorable to the Government. [Citing cases.] If, under such view of the evidence he concludes that a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion should be overruled and the issue left to the jury. It is only where under such view of the evidence he concludes there must be such a doubt in a reasonable mind, should the motion be granted."

The defendants contend that there is no evidence from which a jury could find that the defendants intended to acquire the power to exclude competition or fix prices. The parties agree that

the defendants did not have monopoly power during the relevant time period.[2]

■ In response to the defendants' motion the government cites the following evidence of specific intent: (1) statements of employees of the defendants, (2) acts of the defendants constituting "cost pressure" on Chrysler to eliminate its fleet programs, (3) the levels of the defendants' market penetrations, and (4) the size of the defendants.

### 1. Statements of Employees

In its brief[3] the government asserted the following with respect to statements of General Motors' employees:

"1. In February 1967, Frederic Donner, then Chairman of GM's Board of Directors, told a group of dealers that GM was going to exert 'competitive pressures' to stop GM's competitors from using price concessions to erode GM's fleet market share. (Exhibit GX GM–1187, pp. 50–51.)

2. In early 1968, John DeLorean, then Vice President and General Manager of GM's Pontiac Division, recommended to Edward Cole, President of GM, that GM match all competitors' fleet programs as a means to get the competitors to stop using such price competition to gain market shares. DeLorean explained his idea in the following testimony:

. . . cutting your price on any given product will give you an incremental amount of business. My feeling was that if General Motors would say that regardless of the program the other person is going to engage in, we will be competitive, that that would, in effect, destroy the advantage of cutting price because that meant you were automatically going to be competitive with them.

3. On May 21, 1968, GM's Marketing Policy Group considered the same problem that DeLorean had analyzed. A presentation made to the Group on that date stated:

. . . competition has adopted the strategy of positioning themselves just far enough ahead of GM to secure additional sales volume. So long as they can cost-justify this additional volume, it is likely they will continue this strategy. (Exhibit GX GM–3, p. 22.)

At this meeting, the Marketing Policy Group adopted the substance of DeLorean's suggested approach. In so doing, GM increased its fleet programs for daily rental companies to offset Chrysler's price advantage through direct leasing.

4. In August 1968, Henry Crawford, GM's Vice President of Marketing, told NADA that GM's fleet market share had been cut from 61 percent in 1963 to 40 percent in 1966 because competitors had fleet programs while GM had none. He said that GM would not abdicate the fleet business. (Exhibit GX GM–1184, pp. 3, 4.)"

The government contends that the following, from a Ford draft budget for the model year 1969, is evidence of specific intent to monopolize:[4]

"A draft budget for the Ford Division stated (Exhibit GX F–342, p. 3):

. . . it will be essential to basically meet Chevrolet in the daily rental market and meet Chrysler's pricing pattern in other areas or that organization can continue indefinitely to erode the Ford and Chevrolet share of the market without fear of competition. In the years 1964–1967, Dodge/Plymouth penetration has increased in various

---

2. This is significant because if the defendants did have monopoly power in the relevant time period, the government would not have to prove *specific* intent. "[N]o monopolist monopolizes unconscious of what he is doing." United States v. Aluminum Co. of Amer., 148 F.2d 416, 432 (2d Cir. 1945).

3. Government's Memorandum Regarding Count Two of the Indictment, at 3–4.

4. Id., at 6.

individual segments of the market as follows:

| | |
|---|---|
| Daily Rental | 12.0 percentage points |
| Long-Term Leasing | 3.3 percentage points |
| Commercial Fleet | 3.6 percentage points |

Unless met directly, this will continue and will affect Ford's progress in the manner that it has Chevrolet. We are feeling the effect of Chrysler's having fleet programs over a period of three years, substantially in excess of ours. Ford felt the impact in commercial fleet in 1967, and in 1968 in certain large accounts, such as PHH, Ford is running a poor third at 24 percent, with Plymouth at 36 percent. Meeting Chrysler programs involves an increase in the fleet and leasing allowance."

The court has carefully considered not only these contemporaneous statements but also the testimony illuminating them. Regarding the GM employee's statements, the court concludes that no reasonable inference of intent to control the market can be drawn. Rather, the statements evidence only an intent to compete with Ford and Chrysler.

Regarding the statement in the Ford draft budget, the court is likewise persuaded that the only reasonable inference is one of intent to compete. There is an additional difficulty with the use of this statement. It was contained in a *draft* budget; the final approved budget did not incorporate this language.

2. Acts Constituting "Cost Pressure" on Chrysler

The evidence shows that Ford and General Motors together had 87.5% of the fleet market in 1962, while Chrysler had 9%. By 1968, Chrysler's aggressive fleet programs had increased its penetration to 24.3%. For the 1969 and 1970 model years, Ford and General Motors instituted parallel "buy back programs" for the daily rental segment of the market. When compared to the Chrysler programs, these programs offered substantially identical benefits. During 1969 and 1970 Chrysler lost 4.-4% of the market to the defendants. For the 1971 model year the programs were dropped, and Chrysler regained 4% of the market.

The government contends, based on two Ford documents and three General Motors documents, that when the defendants instituted the programs, "their intent in doing so as to teach Chrysler a lesson and to discourage Chrysler from using price concessions",[5] and that this constituted cost pressure on Chrysler.

The court has scrutinized these documents carefully and finds in them no evidence from which a jury could infer a specific intent to exclude competition. Regarding both these documents and those discussed in part 1, *supra*, the government would have the jury infer an intent to monopolize from the plainly stated intent to compete. Thus the government would like to have the jury infer a specific intent that is the exact opposite of the intent evidenced in the statement. This the court will not permit.

3. Market Penetration Levels

In its brief the government relies heavily on American Tobacco v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). It argues that since the facts of the cases are similar, and the Supreme Court permitted an inference of intent to monopolize, the court should allow an inference of intent to monopolize here. While it is true that there is some similarity in the levels of market shares in the two cases, the similarity ends there. Coupled with the market share evidence in *American Tobacco* was overwhelming evidence of unexplained, unnatural and anti-competitive conduct, from which a reasonable inference of specific intent could be drawn. *See* 328 U.S. at 800–808, 66 S. Ct. 1125. But there is a total absence of

---

5. *Id.,* at 2.

such evidence here. It would be most unwise to allow a jury through speculation to infer the requisite intent from the mere existence of certain market share levels. Aluminum Co. of America v. United States, 148 F.2d 416, 429–430 (2d Cir. 1945). Again, the court notes that the government does not contend that Ford and General Motors had monopoly power.[6]

At this point the court notes a dilemma that has burdened the government throughout the case. In Count I it charged the defendants with a conspiracy to fix prices by *raising* them while in Count II it charged the defendants with a conspiracy to monopolize, that is, to exclude competitors. The government thus put itself into the difficult position of having to prove that the defendants' general intent to conspire to *raise* prices was coupled with a specific intent to *exclude* competitors. This is contrary to common sense and experience. Even in an industry where there are few suppliers, price raising by some is bound to lead to increased sales by the others.[7]

Moreover, at one time in this case, Chrysler was named a co-conspirator. Later, it was dropped by the government on grounds that it was unreasonable to charge Chrysler under Count II with conspiracy to exert cost pressure on *itself*, and to exclude *itself* from the market. While this conclusion seems reasonable enough, it was an added burden in the government's task to prove the requisite specific intent on the part of the defendants under Count II, for the uncontroverted evidence showed that in 1970 the defendants lost a portion of the market to Chrysler. Thus, in the case of the defendants also, it would seem to be equally unreasonable, or at least more difficult, to conclude that they had con-

spired together to exclude themselves from the market by forfeiting a portion of the market to Chrysler.

4. Size

Finally, the government cites language in the decision of the Court of Appeals for the Sixth Circuit in American Tobacco Co. v. United States, 147 F.2d 93, 114 (6th Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), in support of its contention that the size of the defendants is evidence from which a jury could infer the requisite intent:

> "[S]ize affords an opportunity for abuse of the power which exists by reason thereof . . . . Size may be considered in connection with other evidence bearing upon the alleged monopolistic practices."

This is sound law, but inapplicable here. The court of appeals did not say that size alone was sufficient to support an inference of specific intent. Rather, the court held that "in connection with other evidence", it may be considered. As noted, there is no such "other evidence" in this case.

The court is mindful of the general directives in the cases that the evidence is to be considered in its entirety, and that the conspiracy evidence is not to be "dismembered". But the court is also mindful that the government must submit *some* evidence, direct or circumstantial, as to each element of the crime charged. In this case the government has not submitted evidence from which a jury could reasonably infer the requisite specific intent to monopolize.

For these reasons a judgment acquitting the defendants from the charge in Count II has been entered.

---

6. *See* n. 2, *supra.*

7. Normally price raising follows, rather than precedes, the acquisition of monopoly power.

But the government did not contend that the former occurred in this case. *See,* n. 2, *supra.*