**MERIT MOTORS, INC., et al., Plaintiffs,**

v.

**CHRYSLER CORPORATION et al., Defendants.**

Civ. A. No. 2000–70.

United States District Court, District of Columbia.

June 30, 1976.

Jerry S. Cohen, Washington, D. C., for plaintiffs.

William O. Bittman, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This is a private antitrust suit for treble damages brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiffs are two franchise Chrysler dealers located in Yonkers, New York, and Metropolis, Illinois. They sought to litigate this case as a class action, and we conditionally certified the class on July 11, 1972. However, upon reconsideration, we decertified the class and dismissed all class action allegations in the complaint on April 15, 1975. Defendants are Chrysler Corporation and three of its wholly-owned subsidiaries.

Plaintiffs contend that certain fleet allowance programs introduced by Chrysler in the 1960's to break the dominance of General Motors and Ford in the fleet automobile market are in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 2(a), (d) and (e) of the Clayton Act, 15 U.S.C. §§ 13(a), (d) and (e) [the Robinson-Patman Act amendment]. Chrysler has introduced a variety of such programs, many of which have been amended or terminated, and a detailed description of

each fleet program [1] is not necessary for the purposes of this opinion. Basically, the programs have involved the payment of allowances (also referred to as subsidies or rebates) to fleet purchasers on new cars they purchase from Chrysler dealers over and above a certain established figure. The significant point is that these programs have operated outside the original price-setting negotiations carried on by the dealers responsible for selling the cars and the fleet purchasers. The purchase price of the cars has always been and remains a matter of negotiation between the dealers and the fleets without any interference by Chrysler. The allowances are merely direct payments made by Chrysler to the fleet purchasers once the price has been agreed to and a purchase consummated between the dealer and the fleet purchaser.

Plaintiffs allege that these allowances have artificially inflated the fleet market demand for Chrysler cars and, as a consequence, have eventually produced an over supply of late-model used Chrysler cars in the market. They maintain that the presence of such a disproportionate number of used Chrysler cars in the market place has depressed the price for all Chrysler cars, including the new cars which plaintiffs sell. In addition, plaintiffs contend that the cost to Chrysler of underwriting these allowance programs has been covered through an increase in the wholesale price of the cars charged to the dealers. Consequently, plaintiffs claim that the fleet programs have caught them in a squeeze between artificially inflated wholesale costs for the cars they buy from Chrysler and artificially depressed prices for the new Chrysler cars which they sell. They have brought this action under Section 1 of the Sherman Act charging that these programs amount to a combination and conspiracy between Chrysler and its fleet purchasers to fix prices, a

Sherman Act Section 1 violation. Plaintiffs also claim that Chrysler and the fleets have been engaging in an unlawful combination and conspiracy to monopolize the sale and lease of Chrysler cars to fleet purchasers in violation of Section 2 of the Sherman Act. Finally, plaintiffs claim that these programs constitute discriminatory pricing in violation of the Robinson-Patman Act.

The case is now before the Court on plaintiffs' motion for partial summary judgment on their first claim (Section 1 of the Sherman Act) and defendants' cross-motion for summary judgment on all three claims (Sections 1 and 2 of the Sherman Act and Sections 2(a), (d) and (e) of the Clayton Act). For the reasons set forth below, we find that plaintiffs have failed to raise a genuine issue of material fact with regard to any of their claims and that defendants are entitled to judgment as a matter of law. Accordingly, we grant defendants' cross-motion for summary judgment as to all three claims set forth in the complaint.

## I. THE STANDARDS TO BE APPLIED IN RULING UPON MOTIONS FOR SUMMARY JUDGMENT IN ANTITRUST CASES.

We are well aware of the rule that motions for summary judgment are to be sparingly granted in complex antitrust cases. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). However, even in antitrust cases as protracted and complex as this case, plaintiffs are not relieved of their burden under Rule 56(e) of the F.R.Civ.P. to support their allegations with something more than naked assertions and broad generalities. In order to defeat a motion for summary judgment, they must support their allegations by "significant probative evidence." *First National Bank of Arizona*

1. A fleet account is generally defined as an entity which annually registers in its name at least ten motor vehicles. Involved in Chrysler fleet allowance programs are three basic types of accounts: (1) commercial fleets (vehicles owned by a business for use of its employees in carrying out company business), (2) leasing companies (such as McCullagh Leasing which

lease to individuals and businesses for periods of one, two or three years), and (3) daily rental companies (such as Hertz and Avis which rent cars to the general public for short periods of time). For a detailed description of Chrysler's Rebate Plan for its taxicab purchasers, see *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876 (S.D.N.Y.1968).

*v. Cities Service,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Summary judgment is a valuable instrument for avoiding unnecessary, lengthy, and costly trials. See *United States v. General Motors Corp.,* 171 U.S.App.D.C. 27, 518 F.2d 420, 440–42 (1975). Once defendants raise serious questions with regard to the foundation of plaintiffs' allegations, plaintiffs may not rest on those allegations but must offer concrete support for them. Without such support, the allegations must fail and judgment must be entered for the defendants.

This case was filed nearly six years ago, and since that time a voluminous record has been compiled. Thirty-three depositions have been taken, twenty-three of which were taken by the plaintiffs, covering thousands of pages of transcript. Scores of documents have been made available for inspection by defendants, and numerous exhibits and affidavits have been filed. Hence, plaintiffs have had many years in which to unearth support for their claims. Under these circumstances, we do not see how a trial could afford plaintiffs any greater opportunity to obtain factual support for their allegations. *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d 102, 110 (2nd Cir. 1975). It is in light of this ample opportunity plaintiffs have had to unearth evidence to support their allegations and in light of the recognized value of Rule 56 as a means for avoiding unnecessary trials even in complex antitrust cases that we now examine each of plaintiffs' claims seriatim.

## II. *PLAINTIFFS' CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.*

■ Plaintiffs base their claim under Section 1 of the Sherman Act on the allegation that Chrysler's fleet allowance programs amount to a combination or conspiracy between Chrysler and its fleet purchasers to restrain trade by fixing the fleet prices for Chrysler cars. Such a price-fixing agreement, if proved, is a *per se* viola-

tion of Section 1. *United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 220–23, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Central to any price-fixing claim is a showing that plaintiffs' pricing independence was somehow restricted. *Checker Motors Corp. v. Chrysler Corp.,* 283 F.Supp. 876, 882 (S.D.N.Y.1968), *aff'd,* 405 F.2d 319 (2d Cir.), *cert. den.,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). We have reviewed the voluminous record compiled in this case, and we have found no evidence that Chrysler and the fleets fixed the price and terms upon which plaintiffs could sell cars to fleet users, or that the fleet allowance programs restricted plaintiffs' pricing independence in any way. On the contrary, the record is replete with evidence of the fact that the dealers continued to negotiate their own prices and terms with the fleets without any interference by Chrysler and entirely outside of the operation of the fleet allowance programs.

■ For example, Loren Kirkpatrick, one of the plaintiffs, testified several times during his deposition that he is completely free to set the price at which, and terms upon which, he wishes to sell to fleet customers.[2] Similarly, Raphael Cohen, representing Merit Motors, Inc., the other plaintiff, when questioned at length during his deposition about one particular transaction between his dealership and Avis, took pride in explaining the hard bargain he had driven, after rejecting Avis' original offer because the price was too low. During the explanation, Mr. Cohen repeatedly emphasized that he is the only one who sets his prices.[3]

In addition to the plaintiffs' own testimony on this subject, the defendants submitted affidavits of eleven Chrysler dealers throughout the United States who, as the chairmen of Chrysler-Plymouth and Dodge dealer organizations, were the elected spokesmen for Chrysler dealers during the life of the programs at issue and would have been aware of any complaints which

---

**2.** Deposition of Loren Kirkpatrick at 92–93, 136–37.

**3.** Deposition of Raphael Cohen at 536–37, 539, 542, 544.

the dealers had about those programs.[4] Each of the affiants, in his sworn statement, attested to his continuing pricing independence and to the fact that he had never received complaints from any dealers to the effect that Chrysler or Chrysler's fleet program fixed his prices.

Furthermore, the defendants submitted the affidavits of two other Chrysler dealers, James Kay, Jr., and Richard Green, both referred to by the plaintiffs in connection with their price-fixing allegations. Each dealer testified that the terms and prices at which he dealt were freely negotiated by him, without any intervention from Chrysler.[5]

It is also relevant to point out that the instant case does not represent the first attempt to question the validity of a Chrysler fleet program on grounds of illegal price-fixing. The Court in *Checker Motors, supra*, thoroughly reviewed a Chrysler Rebate Plan for taxicab purchasers which was virtually identical to the fleet allowance programs challenged in this case, and found that the Rebate Program did not interfere with the dealers' pricing independence. The Court noted in pertinent part:

> On its face Chrysler's Rebate Plan does not curtail the dealer's pricing discretion. Each dealer is free (1) to raise retail taxicab prices, thus nullifying the effect of the rebate; (2) to keep his prices constant, and thus render Chrysler taxicab price competitive vis a vis General Motors, Ford, Checker and other automobile makers who grant similar rebates; or (3) to lower his prices still further in competition against both Chrysler and non-Chrysler dealers alike. No evidence has been offered to the effect that the $183 rebate has even the slightest tendency to restrict in any way the dealer's independent decision and determination as to the retail sales price quoted by him to customers for Chrysler taxicabs. The most that appears from the record before us is that the plan manifests to the taxicab purchaser a desire on Chrysler's part to

promote competitive sale of its taxis, at least to the extent of giving the appearance of a price advantage to the customer in the form of a $183 rebate. Possibly the practice acts as a psychological inducement to the customer that cannot be realized through a direct price reduction to the dealer in the identical amount which would, as a practical matter, enable the dealer in his discretion to reduce his price accordingly. Certainly the market-place is full of similar manufacturer-originated promotional sales "gimmicks," such as "free goods" in the grocery and drug trades, coupons entitling the holder to cash or discounts, and the like, which do not run afoul of the Sherman Act in the absence of a showing of impropriety. The plan does not give as much practical pricing flexibility to the Chrysler dealer as would a direct $183 price reduction in the wholesale price, since the customer, rather than the dealer, is automatically entitled to the rebate upon purchase of a Chrysler taxicab, whereas if Chrysler reduced the price to its dealers by $183, bargaining between each dealer and his customer might ensue to determine how much of the reduction, if any, would be passed along to the retail customer. However, this is an illusory distinction, since the dealer has the freedom to increase his retail price to offset the $183 rebate.

> ▪ Thus there is a failure to show any provision of the plan, or any facts, indicating that the plan would tend to affect the exercise of competitive pricing discretion, or to affect or tamper with the range, level, scale, or amount of the price paid for Chrysler taxicabs, such as appears in price-fixing or distribution agreements that have been struck down as unreasonable without more. *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. Univis Lens Co.*, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1941); *United States v. Socony Vacuum*

**4.** Defendants' Cross-Motion for Summary Judgment, Exhibit C (1–11).

**5.** Defendants' Cross-Motion for Summary Judgment, Exhibits A and B.

*Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In the absence of proof that the Rebate Plan has a tendency to restrict the dealer's pricing independence, or has some pricing effect, it amounts to nothing more than a promotional device which cannot be labelled illegal *per se.*

Plaintiffs, on the other hand, have failed to submit any substantial documentation to refute this overwhelming evidence that Chrysler did not interfere with the pricing independence of its dealers. Accordingly, we find that defendants are entitled to summary judgment on the first claim of the complaint.[6]

### III. *PLAINTIFFS' CLAIM UNDER SECTION 2 OF THE SHERMAN ACT.*

Plaintiffs also allege that Chrysler and its fleet purchasers have engaged in "an unlawful combination and conspiracy to monopolize, have attempted to monopolize, and have monopolized" the sale and lease of Chrysler cars to the fleets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The key in any monopolization case is the definition of the relevant market, and the success of plaintiffs' monopolization claim depends initially upon our accepting their definition of the relevant market as consisting only of the sale and lease of *Chrysler* cars to fleet customers.

We cannot accept this definition. As the Supreme Court held in *United States v. E. I. Dupont de Nemours*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the relevant market consists of all products among which there is an interchangeability or cross-elasticity of demand. Automobiles

are more or less interchangeable items, and the price of one brand affects the demand for other brands. *Packard Motor Car Co. v. Webster Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, 420 (1957).[7] Hence, it is clear that the relevant market herein cannot be limited to the sale of one brand of automobile, but must include the fleet market for all brands of automobiles. Since the record shows that General Motors and Ford have dominated and continue to dominate this general fleet market,[8] Chrysler obviously cannot be found to have monopolized said market. It has never had the power to control prices or to exclude competition and has never acquired or maintained the power to monopolize.

Plaintiffs also allege that defendants have *attempted* to monopolize the fleet market for Chrysler cars. An attempt to monopolize, as defined by the Supreme Court in *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), is the employment of methods or practices which, if successful, would accomplish monopolization and which, though falling short, nevertheless approach so close as to create the dangerous probability of monopolization. As noted above, there is no dangerous probability that Chrysler is about to monopolize the relevant market, *i. e.,* the general automobile fleet market, which is dominated by General Motors and Ford. Plaintiffs argue, however, that the relevant market is not an issue in an attempt to monopolize case, *Lessig v. Tidewater*, 327 F.2d 459 (9th Cir. 1969), and that the only question is whether Chrysler possessed the requisite specific intent to monopolize. We must disagree. As the Court held in *American Tobacco Co., supra,* an

---

**6.** Plaintiffs have also provided little support for their allegation that Chrysler and the fleets entered into a *combination* or *conspiracy* to fix prices. We have difficulty conceptualizing such a *conspiracy or combination since* the record clearly indicates that the fleets negotiated their prices and purchased their cars from the dealers and not from Chrysler. However, we need not reach this issue, for we find that whether or not such a combination or conspiracy existed, there was no interference with the pricing independence of the plaintiffs and, ac-

cordingly, no *per se* violation of Section 1 of the Sherman Act.

**7.** See Report of Professor Richard Staelin at 4–5 and *Deposition of Professor Staelin at 114,* 120, 123, 125.

**8.** Despite its fleet allowance programs, Chrysler still holds a smaller share of the market than General Motors and Ford. Defendants' Cross-Motion for Summary Judgment, Exhibits J and O.

attempt to monopolize occurs when a party creates a dangerous probability of monopolization. It would defy all logic to find on the one hand that there is a dangerous probability of monopolization by Chrysler, and, on the other hand, to find that the market which is threatened is not the relevant market and hence not susceptible to unlawful monopolization. *See American Football League v. National Football League*, 205 F.Supp. 60, 65 (D.Md.1962), aff'd, 323 F.2d 124 (4th Cir. 1963).[9] Clearly, one can threaten to monopolize only that which is capable of being monopolized, and only the relevant market is capable of being monopolized. Accordingly, contrary to plaintiffs' contention, the relevant market is a basic issue in a case charging an attempt to monopolize. In this case there is no danger of Chrysler monopolizing the entire automobile fleet market, which is the relevant market, for the market is dominated by General Motors and Ford. It follows that Chrysler cannot be found liable for attempting to monopolize it.

Furthermore, plaintiffs have failed to demonstrate that Chrysler possessed the requisite specific intent to monopolize, the second element of any attempt to monopolize claim. *United States v. Aluminum Co. of America*, 148 F.2d 416, 431–32 (2d Cir. 1945). Plaintiffs would have us believe that this specific intent can be inferred from Chrysler's introduction of the fleet allowance programs. However, the record clearly indicates that the purpose behind the allowance programs was not to monopolize the fleet market but rather to break the existing dominance of General Motors and Ford in that market.[10] Without its fleet

programs, Chrysler had and would have continued to have only a miniscule percentage of the fleet market.[11] With them it was at least able to assert itself as a competitive force (though by no means a dominant one) in a market dominated by General Motors and Ford.

Therefore, we find that plaintiffs have failed to present any evidence that defendants have either monopolized the fleet automobile market or have created a dangerous probability of monopolizing or have possessed the specific intent to monopolize that market. Accordingly, plaintiffs have failed to satisfy any of the basic elements of their claim under Section 2 of the Sherman Act, and defendants are entitled to summary judgment on this claim.

IV. *PLAINTIFFS' CLAIM UNDER SECTIONS 2(a), (d) AND (e) OF THE ROBINSON–PATMAN ACT.*

Plaintiffs finally allege that Chrysler's fleet allowance programs constitute unlawful price discrimination in violation of Section 2(a) of the Robinson-Patman Act amending the Clayton Act, 15 U.S.C. § 13(a).[12]

To prove their Robinson-Patman claim, plaintiffs must demonstrate (1) that Chrysler charged discriminatory prices to different purchasers, and (2) that this price discrimination had an injurious effect on competition. *FTC v. Anheuser-Busch*, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); *American Oil Co. v. FTC*, 325 F.2d 101, 104 (7th Cir. 1963), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964). The record indicates that Chrysler sells only to one set of purchasers, its deal-

---

9. Turner, "The Scope of 'Attempt to Monopolize'," Defendants' Exhibit C attached to defendants' reply memorandum.

10. See, e. g., Deposition of William C. Hanway, Jr., at 17, and Deposition of Jack B. Sparkes at 10.

11. See Deposition of Paul E. Herzog at 105; Deposition of Robert W. Adams, Jr., at 38; Deposition of Thomas W. Roberts at 16, 20–21; Deposition of James F. Carney at 19.

12. Plaintiffs also allege violations of Sections 2(d) and (e), but we find absolutely no evidence in the record of discriminatory allowances or terms which would constitute violations of these provisions. In addition plaintiffs allege that Chrysler's leasing program violated Section 2(a). However, the Robinson-Patman Act applies only to sales and Chrysler's leasing programs are not sales transactions. *Ken Foster, Inc. v. Chrysler Leasing Corp.*, 9th Cir., January 30, 1974, Doc. No. 73–1167, *cert. denied*, 415 U.S. 990, 94 S.Ct. 1589, 39 L.Ed.2d 887 (1974).

ers, and charges them all the same wholesale price. Hence, Chrysler maintains that it cannot be found to be engaged in any price discrimination between different purchasers. Plaintiffs counter this argument by invoking the "indirect purchaser doctrine." *Checker Motors, supra.* They contend that even though Chrysler may sell directly only to the dealers, the dealers themselves are merely conduits through whom Chrysler indirectly sells to fleets and individual customers. Since the fleets but not the customers receive allowances from Chrysler, they maintain that Chrysler is in effect indirectly selling its automobiles at discriminatorily lower prices to the fleets.

The indirect purchaser doctrine may or may not be applicable to the circumstances of this case. *Checker Motors, supra.* Nevertheless, we need not reach this issue, for we find that the record clearly indicates that even if Chrysler were maintaining a discriminatory pricing program, this price discrimination has had and could have no significant impact on competition. First, the evidence indicates that dealers and fleets do not compete with each other. Dealers purchase for resale; fleets do not. Commercial fleets buy cars to use as capital assets in their businesses and the fact that they dispose of them just as any business disposes of its depreciated capital assets does not, in any way, put them in the automobile business. Often, these fleet cars are traded back to the original dealer in exchange for new cars. Accordingly, a price benefit to the fleets cannot have an injurious impact on the competitive position of the dealers. Second, even if we were to assume that dealers and fleets were in competition, the plaintiffs would still have to demonstrate that there has been a substantial lessening of that competition due to the implementation of the fleet allowance programs. This they have failed to do. All the statistics in the record demonstrate that Chrysler dealers have increased both the absolute number of cars they have sold and their percentage of the retail market during the years since the institution of the programs at issue.[13] Clearly, their competitive position has been enhanced rather than harmed by these programs.[14]

Accordingly, we find that plaintiffs have failed to submit any substantial evidence to support the second element of their Robinson-Patman claim and therefore defendants are entitled to summary judgment on this claim as well.

### V. *INJURY AS AN ELEMENT OF LIABILITY IN A PRIVATE ANTITRUST ACTION.*

Finally, plaintiffs not only have failed to provide any substantial support for their allegations under their various antitrust claims, but they have also failed to show that they have suffered demonstrable injury as a result of the introduction of the fleet allowance programs. An essential element in establishing liability in a private treble damage action under Section 4 of the Clayton Act, 15 U.S.C. § 15, is a showing that the plaintiffs individually suffered injury as a proximate cause of the alleged antitrust violation.[15] *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1971); *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); *Shumate & Co., Inc. v. NASD,* 509 F.2d 147 (5th Cir. 1975). Plaintiffs' attempt to satisfy this requirement rests exclusively on the report of their expert, Professor Richard Staelin. Professor Staelin's report is a general analysis of the forces at work within the automotive fleet market, and it attempts to show that, according to basic economic theory, the fleet allowance programs challenged herein

13. Defendants' Cross-Motion for Summary Judgment, Chart at 162.

14. Regarding the evidence in this posture, it is not necessary to consider defendants' possible defense under Section 2(b) that, assuming a discrimination in price and a consequent effect on competition, any lower prices charged were made in good faith to meet the equally low prices of a competitor. 15 U.S.C. § 13(b).

15. See Court's ruling, April 15, 1975, decertifying class action, hearing transcript at 5–6.

should tend to depress the retail price and increase the wholesale price for Chrysler products. In this way, Professor Staelin theorizes, plaintiffs' profit margins should tend to decrease as a result of the introduction of the allowance programs.

At no time does Professor Staelin provide any statistical support for his theory. In fact, by his own admission, he reached his conclusion without having referred to the record in this case or even having looked at the financial statements of the two plaintiffs.[16] Accordingly, since his opinion is based solely on speculations and hypotheses and is unsubstantiated by any evidence in the record, we accord it little weight. We find that plaintiffs have failed to submit any credible evidence that they suffered individual injury as a proximate result of the introduction of the fleet allowance programs.

Therefore, for all the foregoing reasons, we find that the various fleet allowance programs challenged herein do not constitute violations of the antitrust laws.[17]

An Order consistent with this Memorandum Opinion has been filed this date.

## ORDER

This matter having come before the Court on plaintiffs' motion for partial summary judgment and defendants' cross-motion for summary judgment, and the Court having considered the memoranda in support of and in opposition to the motions and the documents, depositions, and affidavits filed herein, it is this 30th day of June, 1976,

ORDERED, that plaintiffs' motion for summary judgment be, and hereby is, denied; and it is

FURTHER ORDERED, that defendants' motion for summary judgment be, and hereby is, granted.

**16.** Deposition of Professor Richard Staelin at 40–47, 52–54, 59–61, 93–95.

**17.** In *United States v. General Motors*, 369 F.Supp. 1306 (E.D.Mich.1974), General Motors and Ford were charged with having violated

the antitrust laws by conspiring to *eliminate* their fleet allowance programs. It would surely be anomalous to hold Chrysler in violation of the antitrust laws for *retaining* their virtually identical fleet allowance programs.