**DOMINION PARKING CORPORATION and Edward R. Woodward, Plaintiffs,**

v.

**The BALTIMORE AND OHIO RAILROAD CO. and APCOA, Inc., Defendants.**

**Civ. A. No. 77–0418–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

April 5, 1978.

Harry P. Anderson, Jr. and David E. Satterfield, IV, Richmond, Va., for plaintiffs.

Daniel A. Carrell, Hunton & Williams and Thomas G. Slater, Jr., Roberta D. Liebenberg, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff Dominion Parking Corporation (hereinafter "Dominion") is a Virginia corporation currently operating automobile parking lots in Virginia. Plaintiff Edward R. Woodward is a citizen of Virginia and is president and sole stockholder of Dominion. Defendant Baltimore and Ohio Railroad Company (hereinafter "B & O") is a Maryland corporation which formerly leased parking lots to plaintiffs in Richmond, Virginia and Baltimore, Maryland. Defendant APCOA, Inc. (hereinafter "APCOA") is a Delaware corporation which operates parking lots nationwide and currently operates the lots in Richmond, Virginia and Baltimore, Maryland which were formerly leased by B & O to plaintiffs. Jurisdiction over this action is attained pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

Plaintiffs allege that the cancellation of their leases to operate B & O's Richmond and Baltimore parking lots, coupled with the subsequent takeover of these lots by APCOA, constitutes an unlawful conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Defendants have moved for summary judgment on this claim.[2] The matter has been

1. In their original complaint, plaintiffs alleged that defendants' conduct also violated § 2 of the Sherman Act, 15 U.S.C. § 2. The § 2 claim was dismissed with prejudice, pursuant to the plaintiffs' motion under Federal Rule of Civil Procedure 42(a)(2), by this Court's order of January 4, 1978.

2. In Count II of the instant complaint, plaintiffs allege that defendant B & O made false representations to the plaintiffs which induced Dominion to enter into a lease agreement for one of the Baltimore lots. Defendants have not moved for summary judgment on this count, and it is not an issue in the instant motion.

briefed by the respective parties, a hearing has been held, and the issue is now ripe for disposition. For the reasons stated herein, the defendants' motion for summary judgment will be granted.

The record reflects the following undisputed facts:

Between August 1970 and November 1975, plaintiffs entered into five leases with defendant B & O (or related companies[3]) for properties to be operated as commercial parking lots in Richmond, Virginia and Baltimore, Maryland. Each lease provided that the lessee would operate a parking lot on the leased premises and would pay the lessor, as monthly rent, 75% of the gross receipts from the prior month. Two of the leases provided for termination by either party upon ninety days notice; the other three leases provided for termination by either party upon thirty days notice. By letters from B & O, the lessor, on the dates of November 29, 1976 and December 31, 1976, all five leases of plaintiffs were terminated. Subsequent thereto, B & O entered into lease agreements with APCOA which provided that APCOA would operate parking lots previously operated by plaintiffs.

Plaintiffs allege that the terminations resulted from a conspiracy between B & O and APCOA in restraint of interstate commerce and that the conduct of the defendants thus violates § 1 of the Sherman Act, 15 U.S.C. § 1. That statute provides, in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce among the several States,* or with foreign nations, is declared to be illegal. [Emphasis added.]

Defendants move for summary judgment on the Sherman Act claim on grounds that the alleged conspiracy between B & O and APCOA, even if proved, was not "in re-straint of trade or commerce among the several states."

■ Generally, summary judgments are not favored in anti-trust litigation. In *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), speaking through the late Mr. Justice Clark, the Supreme Court cautioned:

> We believe that summary procedures should be used sparingly in complex anti-trust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. [Footnote omitted.]

But the mere invocation of *Poller* by an antitrust plaintiff is insufficient to ward off a motion for summary judgment. *See Mutual Fund Investors, Inc. v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977). Nor can those who suffer injury in business automatically avoid summary judgment simply by casting their grievances in antitrust terms. When properly used in antitrust cases, summary judgment remains "a valuable instrument for avoiding unnecessary, lengthy, and costly trials." *Merit Motors, Inc. v. Chrysler Corp.,* 417 F.Supp. 263, 267 (D.D.C.1976).

In the Court's view the instant case is an appropriate one for summary judgment on the antitrust claims. The issue is not conspiracy, but rather the effect of an alleged conspiracy on interstate commerce. The *Poller* warning is thus muted because motive and intent are not at issue. Moreover, the facts concerning the effect of the alleged conspiracy on interstate commerce have been well developed through detailed discovery and affidavits in that regard. The Court is fully satisfied that no genuine issues of material fact remain concerning the threshold question of interstate commerce. The motion for summary judgment is thus ripe.

---

3. Plaintiffs have moved the Court for leave to join the James Center Development Co., the Chesapeake and Ohio Railroad Company, the Chessie System, Inc. and Chessie Resources, Inc. as defendants in this action. These additional parties are lessors of three of the five lots which are the subject of plaintiffs' antitrust claims. Since summary judgment is being granted on the antitrust claims, plaintiffs motion to join these additional parties as defendants will be denied.

■ Because the Court concurs with the defendants' position that plaintiffs have not countered the defendants' challenges with any "significant, probative evidence" to support the claim that the alleged conspiracy between B & O and APCOA was in restraint of interstate commerce, summary judgment on that count must be awarded in favor of defendants. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Aaron E. Levine and Co. v. Calkraft Paper Co.,* 429 F.Supp. 1039 [1977] (E.D. Mich.1977).

The United States Court of Appeals for the Fourth Circuit has explained:

An antitrust plaintiff may establish the necessary connection with interstate commerce in either of two ways: by demonstrating that the alleged anticompetitive conduct occurred in interstate commerce, or by showing that conduct, though wholly intrastate, had a substantial effect on interstate commerce.

*Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 395 (4th Cir. 1974).

The first of these ways, the so-called "in commerce" test, reaches "only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services *for interstate markets* and their transport and distribution to the consumer." *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). Applying this standard to the instant case, the Court is satisfied that plaintiffs are not "in commerce." The plaintiffs do not contend that they generate any goods or services "for interstate markets." They do not contend that they make any interstate sales or that they are directly involved in any national markets, or that the local market in parking spaces is "an integral part of the interstate market in other component commodities or products." *Gulf Oil Corp. v. Copp Paving Co., supra* at 195–96, 95 S.Ct. at 399. Plaintiffs do not even contend that their customers drive to the parking lots from out of state. In plaintiff Woodward's deposition, he indicated that nearly all of those who use the Baltimore lots are from Maryland and that nearly all of those who utilize the Richmond lots are from Virginia.

Rather, plaintiffs attempt to show that they are "in commerce" by reciting a variety of interstate activities in which they have engaged over the years. These interstate activities can be divided into four broad categories.

The first category encompasses activities relating to the negotiations of the leases and the preparation of the parking lot sites. For example, plaintiffs allege that the negotiations for several of the leases involved interstate communications and travel; that 200 concrete bumpers and a prefabricated metal building were manufactured in Richmond and shipped to Maryland for use at one of the Baltimore lots; and that fencing for a Baltimore lot was paid for by a check drawn on a Baltimore bank but mailed from Richmond. In the Court's view, none of these interstate transactions satisfies the "in commerce" test under the Sherman Act. Such "one shot" activities cannot convert an essentially local business into an interstate enterprise. *Lieberthal v. North Country Lanes, Inc.,* 332 F.2d 269, 271–72 (2d Cir. 1964); *Penthouse International, Ltd. v. Putka,* 436 F.Supp. 1220, 1229–30 (N.D.Ohio 1977).

The second category of activities concerns the interstate flow of money and documents in the routine operation of the parking lot business. For example, plaintiffs sent a total of over $800,000.00 in rental checks from Richmond to Cleveland; plaintiffs sent daily reports and monthly statements from Richmond to Cleveland; liability insurance for the lots was issued by a New York company; and pay-checks for Dominion employees in Baltimore were mailed from Richmond. In the Court's view, these activities also fail to satisfy the "in commerce" test. The payment of rent across state lines does not alter the basic fact that the parking spaces which plaintiffs rented to their customers never moved an inch. Passage of checks, reports and other documents from one state to another cannot transform such a purely local busi-

ness into an activity of interstate commerce.[4] As stated in *Joe Westbrook, Inc. v. Chrysler Corp.*, 419 F.Supp. 824, 837 (N.D. Ga.1976):

> If the Court were to hold that the exchange of documents across state lines was sufficient to meet the *in* commerce test, as alleged in part by plaintiffs, then practically no commercial enterprise in our increasingly national economy would escape the scope of the Sherman Act. [Footnote omitted.]

The Court is of the view that the same reasoning applies as well to interstate telephone calls made in connection with the instant plaintiffs' business. The Sherman Act was not intended to be coextensive with the Bell System.

The third category of activities recited by plaintiffs covers several instances of interstate travel. First, Mr. Woodward traveled from Richmond to Baltimore at least once a week during the planning and approval period of a Baltimore lot, on one occasion bringing a crew from Richmond to Baltimore to lay out and prepare the lot. The Court considers such interstate travel in the preparatory stages irrelevant to a Sherman Act inquiry. *See Lieberthal v. North Country Lanes, Inc., supra.* Second, auditors traveled annually from Cleveland, Ohio to Richmond to audit financial statements for the Richmond lots. This travel is also inconsequential, in the Court's view, because nothing was bought or sold as a result of the auditors' trips to Richmond. There was no "trade" involved in the audit. Third, plaintiffs contend that at least one of their Baltimore lots is "in commerce" because approximately 100 commuters leave their cars at the lot each day before boarding the B & O Railroad for the train to Wash-

ington, D. C. This argument, in the Court's opinion, is specious. The United States Supreme Court many years ago stated that "the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey . . . is not a constituent part of the interstate movement." *United States v. Yellow Cab Co.*, 332 U.S. 218, 231–232, 67 S.Ct. 1560, 1567, 91 L.Ed. 2010 (1947). Thus, it was held that "when local taxi cabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." 332 U.S. at 233, 67 S.Ct. at 1568. The parking lot in the instant case stands on the same footing. It is not an "integral part" of the commuters' interstate journey.

The last category of activities concerns the flow of supplies in interstate commerce. Specifically, plaintiffs allege that certain tickets and decals for their customers were purchased from a Philadelphia, Pennsylvania company and shipped to Richmond, Virginia. Some of these tickets and decals were taken to Baltimore. Additional decals were later purchased in Richmond for use in Baltimore. There is no question that these tickets and decals traveled in interstate commerce and were used in the day to day operation of plaintiffs' parking lots. The Court's view, however, is that plaintiffs were not "in commerce" simply by virtue of the tickets and decals. Customers who drove into plaintiffs' lots were paying for parking spaces, not tickets or decals. Such

---

**4.** The Supreme Court's decision in *United States v. South-Eastern Underwriters Assoc.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), does not indicate otherwise. That case held that an insurance company which conducted a substantial part of its business by the exchange of policies and other documents across state lines was "in commerce" within the meaning of the Commerce Clause and was hence subject to the Sherman Act. The Court did not hold, however, that all of the policyholders were "in commerce" simply because they sent checks or other communications across state lines to the insurance companies. By analogy, the instant plaintiffs are not "in commerce" merely by virtue of sending their rent and other items across state lines to their lessors. Judicial endorsement of such a theory would make a mockery of the "in commerce" test under the Sherman Act. Of course, whether such interstate communications may be of sufficient magnitude to satisfy the "substantial affect" test under the Sherman Act is a separate issue.

**446**

rental of parking spaces is a local affair, and the plaintiffs' use of tickets and decals from other states does not turn it into an interstate business. This view accords with the view expressed by the United States Court of Appeals for the Ninth Circuit in the frequently cited case of *Page v. Work,* 290 F.2d 323 (9th Cir. 1961) (affirming grant of summary judgment to defendants in an antitrust case). That case stated that a newspaper is not "in the flow of commerce" simply because the newsprint, ink and other necessary supplies are received from out of state. 290 F.2d at 330.

In summary, the Court is satisfied that the parking lot business of the instant plaintiffs is not "in commerce" within the scope of the Sherman Act. This conclusion does not complete the Court's inquiry, however, for "it is well established that an activity which does not itself occur *in* interstate commerce comes within the scope of the Sherman Act if it substantially *affects* interstate commerce." *Burke v. Ford,* 389 U.S. 320, 321, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967).

■ The landmark case in determining whether local activity "substantially affects" interstate commerce is *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In that case, plaintiff alleged that defendants were violating the Sherman Act by engaging in a conspiracy to block the planned expansion of a hospital operated by plaintiff. The Supreme Court, reversing the circuit court's *en banc* opinion, held that the complaint adequately alleged a restraint of trade substantially affecting interstate commerce and therefore could not be dismissed on the pleadings. The Supreme Court reasoned as follows:

> The complaint, fairly read, alleges that if respondents and their co-conspirators were to succeed in blocking petitioner's planned expansion, petitioner's purchases of out-of-State medicines and supplies as well as its revenues from out-of-state insurance companies would be thousands or perhaps hundreds of thousands of dollars less than they would otherwise be. Similarly, the management fees that petition-

er pays to its out-of-state parent corporation would be less if the expansion were blocked. Moreover, the multimillion dollar financing for the expansion, a large portion of which would be from out of State would simply not take place if the respondents succeeded in their alleged scheme. This combination of factors is certainly sufficient to establish a "substantial effect" on interstate commerce under the [Sherman] Act.

425 U.S. at 744, 96 S.Ct. at 1852.

The combination of factors in the instant case is in the Court's view totally different. The *Hospital* case concerned the potential effect on interstate commerce of *blocking* proposed expansion; the instant case concerns the potential effect on interstate commerce of *substituting* one parking lot operator for another. Although plaintiffs are affected by the substitution, interstate commerce is not. Plaintiff Wooodward willingly admits that the parking lots continue to operate in essentially the same manner that they did before the change in operators took place. The purchases of out-of-state supplies and the premium payments to out-of-state insurance companies are not "thousands or perhaps hundreds of thousands of dollars less than they would otherwise be," nor are rental fees to the out-of-state lessor any less under APCOA's management than they were under plaintiffs' supervision. On the contrary, the interstate flow of money and supplies appears to be substantially the same now as it was when plaintiffs operated the lots. The Court therefore concludes, based on the relevant affidavits, depositions and answers to interrogatories, that the alleged conspiracy by the defendants has had no "substantial effect" on interstate commerce under the Sherman Act.

The Court's conclusion is buttressed by the holdings of numerous other courts that the termination of one distributor and the substitution of another in the same capacity does not violate § 1 of the Sherman Act. *E. g., Knutson v. Daily Review, Inc.,* 548 F.2d 795, 803 (9th Cir. 1976); *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir. 1975); *Craig v. Sun Oil Co. of Pa.,* 515

F.2d 221, 223 (10th Cir. 1975). In *Burdett Sound,* for example, the court stated:

> Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.

515 F.2d at 1249. Similarly, in *Craig* the court stated:

> We have held that a conspiracy which results merely in the substitution of one distributor for another does not violate 15 U.S.C. § 1.

515 F.2d at 223.

In the instant case, the plaintiffs as operators stand in the same position as the terminated distributors in the cases the Court has heretofore cited. Consequently, in the Court's view plaintiffs have failed to state a claim on which relief can be granted under the Sherman Act.

An appropriate order shall issue.